Filed 8/13/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S137730 |
| v. | ) | |
| | ) | |
| TROY LINCOLN POWELL, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA240299-01 |
| _____ | ) | |

A jury convicted defendant Troy Lincoln Powell of the first degree murder of Tammy Epperson (Pen. Code, § 187, subd. (a))[1] and found true three special circumstance allegations: that the murder was committed while defendant was engaged in the commission of rape (§ 190.2, subd. (a)(17)(C)) and mayhem (§ 190.2, subd. (a)(17)(J)), and the murder involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also convicted defendant of forcible rape (§ 261, subd. (a)(2)), mayhem (§ 203), and torture (§ 206). In a separate proceeding, the jury found that defendant was sane when he committed the crimes of which he was convicted.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The original jury was unable to reach a verdict in the penalty phase, but a newly-selected jury returned a verdict of death after a second penalty proceeding. Defendant moved for a new trial and for modification of his sentence to life without the possibility of parole. The trial court denied those motions and sentenced defendant to death.[2] This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

Tammy Epperson was a recovering heroin addict who had recently completed a 12-step treatment program and held a responsible job. Epperson lived on her own at Ballington Plaza, an apartment complex that accepted referrals from substance abuse recovery and inmate rehabilitation programs. The property manager there described Epperson as "a very good tenant. . . . [S]he took care of herself. She spoke well, she was very proud of what she was doing . . . , and she paid rent on time." Her apartment was "very neat, everything in the right places."

Defendant met Epperson in the summer of 2000, while he was residing at Weingart Center in Los Angeles, which provided short-term housing and programs for persons recovering from substance abuse. Defendant had recently been released from prison. Epperson had gone to Weingart Center to visit Timothy Todd, a mutual friend of defendant and Epperson who was working there. Defendant noticed Epperson and later asked Todd to introduce him to her. Epperson was "hesitant" to meet defendant because "she didn't want a

---

[2] The court also sentenced defendant to the upper terms of eight years on the convictions for forcible rape and mayhem and to life imprisonment on the torture conviction, all to be served concurrently and stayed pursuant to section 654.

relationship" at that time. Not long before, Epperson had broken off a romantic relationship when she discovered that her boyfriend, Ronald Sims, had lapsed back into substance abuse. Todd persisted, however, and Epperson eventually relented. Defendant, Epperson, and Todd soon began spending time together, attending movies, eating out, and driving together in defendant's truck.

The nature of defendant's relationship with Epperson was the subject of conflicting testimony. Todd, who was employed as Epperson's assistant and claimed to be her confidant, did not believe she and defendant were ever romantically involved. Photographs and other evidence, however, suggested that Epperson and defendant eventually spent time together in Todd's absence. Without question, defendant became obsessed with Epperson, declaring to Todd that he loved her and saying, "If I can't have her, nobody will. I'll kill her and myself." At some point, he became upset that she was "hanging around with other men." Defendant began to appear uninvited at Epperson's workplace and to call her repeatedly. His behavior eventually became distressing to Epperson. In late October 2000, Todd testified, Epperson broke off relations with defendant, but he continued to call her "constantly" at work.

On a Sunday in early November, defendant was loitering across the street from Epperson's church after services ended. She spotted him while she was standing outside the church, talking with Sims. Epperson and defendant were both Caucasian, while Sims was African-American. As will be discussed below, the inter-racial character of Epperson's relationship with Sims may have been an irritant to defendant, who was affiliated with a white supremacist gang while in prison.

Epperson told Sims she had to "deal with this matter now," referring to defendant, and crossed the street to talk to defendant. According to the visitors' log at Ballington Plaza, defendant and Epperson entered the building that morning

3

at 10:45 a.m., and defendant left at 1:26 p.m.  The afternoon security guard, however, saw defendant walk through the lobby toward the exit doors between 2:00 and 3:00 that afternoon.  Because the building required all guests to be escorted, the guard, who was familiar with Epperson and defendant, stopped defendant and asked him where Epperson was.  Defendant replied that she was " 'in her unit resting.' "  Later that day, defendant twice called Todd to ask him to check on Epperson, saying he had killed her, but Todd did not take defendant seriously.

The police did not enter Epperson's apartment until the next day, after she failed to appear for work.  Epperson's body was lying on the floor, and her apartment appeared to have been ransacked.  Two days later, defendant was arrested at a local motel.  Epperson's keys were found on a table next to the bed in the motel room.

Conclusions about the manner of Epperson's death were based largely on forensic evidence regarding the condition of her apartment and her body.  Officer Ronald Raquel, a criminalist who specialized in blood spatter and sexual assault analysis, examined Epperson's apartment on the day following the killing.  Raquel said Epperson's body was located in the center of the apartment's living quarters, between the bed and a chest of drawers.  She was wearing a blouse and hooded sweatshirt on the upper portion of her body, but she was nude from the waist down, with a towel covering her lower body.  Her brassiere, underneath the clothing, had been pushed up above the nipples of her breasts.  The condition of her blood-soaked sweatshirt suggested that her head had been lying on top of it for some time without moving.  A pair of jeans and women's panties were piled at her feet.  Blood stains and spatters were found throughout the living quarters and bathroom of the apartment.

Using a large number of photographs, Raquel described the pattern of blood residue in the apartment, explaining the inferences that could be drawn from the size, shape, and location of the stains and spatters. Based on his observations, Raquel inferred that the assault began in the bathroom, where Epperson's head was slammed against the wall at least six times as her knees gave out, resulting in a descending pattern of smears. She was then carried into the living quarters and placed near the bed in the spot where her body was found. There the attack continued.

Large pieces of a plaster flower vase and a hard lamp, both weighing at least ten pounds prior to breaking apart, were strewn about. Portions of each had been used to strike Epperson's head repeatedly. She had also been struck with a wooden footstool and, after the footstool broke apart, its individual pieces. The cord of the lamp had been wrapped around her head. Blood stains on the jeans at her feet were consistent with a pair of bloody hands unfastening the jeans and forcing them down. The inner surface of her thighs contained residues consistent with "a bloody object [making] contact with the victim's thighs after the . . . blue jeans were removed." A screwdriver found under Epperson's arm had blood on the tip and could have been used to inflict a wound below her eye.

Following the assault, the assailant ransacked the apartment, going through Epperson's closet, drawers, and other property. Paper towels thrown into the toilet had been used to clean a bloody object, possibly a pair of hands.

Yulai Wang, M.D., a deputy medical examiner who performed an autopsy on Epperson, testified about the condition of her body. Dr. Wang concluded that Epperson died from multiple blunt force injuries. Epperson had bruises and abrasions on the back of her arm, hands, and her right leg that Wang characterized as "defensive wounds," presumably suffered as Epperson sought to protect herself. Blows to her head had caused a large laceration on her forehead, with an

5

underlying open skull fracture, and there were multiple lacerations on her forehead, both eyes, nose, cheeks, and upper and lower lips, both inside and outside. The wound to her lower lip went "through and through," and the open skull fracture was "deep in through the inside of her head." She also had a seven-inch gaping skull fracture on the left side that ran from the front to the back of her head and extensive fractures to the front and base of her skull. Her nose and both cheekbones were fractured, and her face had been flattened by fractures of the underlying facial bones. Three separate wounds had been cut into the left side of her neck and head, three-quarters of an inch, one and one-half inch, and two and one-half inches long. A similar wound was on the right side of her neck. These wounds had been inflicted by a sharp, irregular object, such as broken glass, rather than a knife. None of these cuts had severed the carotid artery, an injury that would have been promptly fatal. Hemorrhaging in her eyes and bruises on her neck suggested strangulation. Her brain showed bruising and bleeding in several different places, and an area of bleeding beneath her scalp "almost cover[ed]" the right side of her head. Pieces of glass of different colors were removed from her body, clothing, head, and hair. In a career involving over 2000 autopsies, Dr. Wang had seen only a "very small number" of beatings this severe.

Epperson also suffered injuries suggestive of sexual abuse. She had bruises and abrasions in the back and both sides of her vaginal area, with hemorrhaging under the skin. Dr. Wang concluded these injuries had been caused by "the blunt force penetration either by a penis with a lot of force or other kind of object of similar shape and size." She found the extent of trauma suffered by Epperson to this part of her body to be "very rare[]."

Because death causes a loss of blood pressure, Dr. Wang testified, injuries inflicted after death do not cause bruising and bleeding. Accordingly, she concluded that the "majority" of Epperson's injuries, perhaps as much as 95

6

percent, were inflicted while she was still alive, including the extensive injuries to her vaginal area, face, and neck.

The parties stipulated that DNA analysis identified defendant's blood on Epperson's jeans and panties, her inner thighs, and a washcloth and plastic water bottle found in the sink. In some of these areas, Epperson's blood was mixed with that of defendant, and her blood was identified in samples collected around the living quarters. Defendant's DNA was found in a vaginal swab, and his sperm was found in and outside her vagina.

The prosecution also presented evidence of two prior assaults by defendant. A former girlfriend testified that, in 1992, she attempted to end their three-year relationship. Defendant responded that he would kill her. He grabbed her by the throat, dragged her to the ground and down the driveway, and kicked her twice in the head and neck. As he dragged her, he told her, "You're going to die." Neighbors prevented any further injury, but the woman has had lingering neck pain. The second assault victim met defendant in January 1999 and had a few dates with him. Two months after they met, she told him to stay away from her. Soon after, defendant lured her to his apartment, where he blocked the door with a chair and began yelling at her. When she responded, he hit her in the face, knocking her to the ground, climbed on top of her, and choked her into unconsciousness. When she recovered, defendant ordered her at knife-point to take off her clothes, tearing at them in his impatience. Eventually, defendant forced her, still at knife-point, to take him with her while she picked up her children from day care and then to drive him home. Defendant continued harassing the woman with telephone calls until she reported him to the police.

## 2. *Defense evidence*

Testifying in his own defense, defendant confirmed that he met Epperson in June 2000, while he was living at the Weingart Center and working as a tutor in its computer lab. At the time, he was being medicated with Sinequan, a sedative that helps control paranoid feelings, as well as Depakote and Paxil. Without the medications, defendant suffered from paranoid anxiety. Through the end of July, defendant saw Epperson while in the company of Todd, but later Todd "no longer was basically in the picture anymore." Epperson began to call defendant and invite him to visit her. By mid-August, he had a "standing invitation" to go to Epperson's apartment. On Fridays, defendant would escort Epperson from her place of employment to the bank to deposit cash generated at the business, and during a transit strike in September he drove her to and from work. In late September, they began having sexual relations. Around that time, defendant stopped taking his medication, believing the medications made it difficult for him to maintain an erection. Photographs of Epperson's apartment taken by defendant displayed a variety of small gifts he had given her, and he identified a series of furnishings he helped to install.

One week before the killing, defendant said, he called Epperson to tell her he was leaving Los Angeles for a period of time because he "needed some time away." During the conversion, he told Epperson he "expected to be put No. 1" among her male friends. When they spoke the next day, Epperson was angry because defendant had not consulted her about his decision to leave. They exchanged repeated calls that day, and Epperson eventually pleaded for defendant to return to her. He agreed that they would "call a truce and try and work this out." The day before the killing, they spent most of the day together, shopping and visiting Epperson's son. In the evening, they had sexual relations.

8

Epperson's church was located across the street from the Weingart Center, where defendant resided. On the morning of the killing, defendant testified, he saw Epperson standing outside the church, while he was standing outside the Center. As he watched, Sims approached her. She then crossed the street to where defendant was standing and asked him to walk her home. When they arrived, she asked him to come in. They later drove to a Christian book store, returned to the apartment, and had consensual sexual relations. After they finished, Epperson went to the bathroom and took a telephone call. From Epperson's side of the conversation, defendant said, he could tell she was making social plans with someone. When defendant asked her what the call concerned, she told him he did not "run her life" and refused to tell him who had called, other than it was a person from her church. An argument ensued, during which Epperson, standing in the bathroom, told him they were "done." Defendant, feeling "crushed," struck her. He had no memory of what happened after that, although he remembered seeing her on the floor. He said he had "blanked out" like this a few times before. Defendant testified that he neither planned nor intended to kill Epperson.

The defense also presented testimony from an expert witness regarding the biological materials found on the panties lying at Epperson's feet, suggesting they had been worn, if at all, for a short time before being removed.

### 3. *Prosecution rebuttal evidence*

Charles Vannoy, who acknowledged knowing defendant "[a] little bit, vaguely" from prison, repeatedly denied remembering the substance of an interview he had with police following Epperson's killing. Over defense objection, the prosecution was permitted to play a redacted videotape of the

interview, which occurred three days after the killing and prior to defendant's arrest.

During the interview, Vannoy told police he first met defendant in prison in December 1999, and they became friends. After their release, Vannoy saw defendant at the Weingart Center, and defendant helped him move into an apartment three days before the killing.

Late in the afternoon on the day Epperson was killed, Vannoy told the police, defendant called him and asked to come to Vannoy's apartment. When defendant arrived, he was anxious and did not want to talk about what had happened. Instead, he made phone calls to family members and others. Very early the next morning, defendant told Vannoy he had beat Epperson to death because she had "rejected him" and "was seeing somebody else." Defendant said he had been having sexual relations regularly with Epperson for two weeks to a month prior to her killing. On the day of the killing, a man phoned Epperson shortly after she and defendant finished having intercourse, and she appeared to make plans to see the man. During an ensuing argument, Epperson insisted defendant did not "own" her and that she would see "who I want, when I want." He then followed her into the bathroom, told her to sit on the toilet, and hit her with a candle holder. As defendant was beating her, Epperson asked why he was doing it. He told her, "All I wanted you to do was to love me, you know, and you wouldn't do that." At some point during the beating she asked, "Are you going to kill me, Troy?" and he responded, "Yes, Tammy, I am. I am going to kill you." Defendant told Vannoy he cut both sides of Epperson's neck with glass, hit her on the head with a wooden stool and a big lamp, and drove a screwdriver or ice pick into her head, leaving a "big hole" in her forehead.

After some sleep, defendant signed over ownership of his truck to Vannoy and then asked Vannoy to take him to Hollywood. When Vannoy dropped him

10

off, defendant said he was going "to have fun for a couple days" and then turn himself in. He said he first intended to steal money from Epperson's place of employment, using keys he had taken from her.

The prosecution also called a detective who had searched Epperson's apartment. The detective stated that he found a broken candle holder in the bathroom and a broken stool and lamp elsewhere. The officer had also seen "a hole to the middle of [Epperson's] head" when he observed the body. The detective later went to Epperson's place of employment and confirmed that the keys found in defendant's possession at the time of his arrest fit the locks on its doors. Finally, the detective described various wounds on defendant's body at the time of his arrest, including cuts and bruising on his hands, a small cut on his forehead, and a one-inch cut on his calf.

**B. Sanity Phase Evidence**

Following defendant's conviction in the guilt phase, the same jury heard the trial of defendant's insanity defense.

*1. Defense evidence*

Kyle Boone, Ph.D., a clinical neuropsychologist, administered to defendant a series of "objective" standardized tests designed to detect brain abnormalities. Dr. Boone found defendant's intelligence to be at the low end of the average range. Defendant did "well" on most of the characteristics measured, but his problem solving skills, involving reasoning and logic, were "very low, very impaired." The tests on which defendant performed poorly measured the ability to think creatively to solve problems, evaluate the consequences of behavior, and cease behavior that is not appropriate to a situation. On a test that measured the "ability to inhibit," or to stop behavior that is inappropriate or incorrect, defendant scored in the second percentile, suggesting "that in his daily life he would have a

11

great deal of difficulty stopping a behavior that was not appropriate to the situation."

Dr. Boone concluded that defendant's poor performance on these particular tests demonstrated that the frontal lobes of his brain, which enable problem solving, emotional expression, and empathy, were "not working correctly" due to "brain damage or brain dysfunction." The dysfunction would cause defendant to make bad decisions and lose control of his behavior. Stressful circumstances and alcohol would worsen this effect. According to Dr. Boone, a person who performed like defendant did on the tests "really doesn't have the brain equipment, the hardware, so to speak, to control their behavior. They simply don't have the apparatus to make reasoned decisions about their behavior."

Part of Dr. Boone's testing involved an evaluation of defendant's good faith in participating in the tests, and Dr. Boone, a specialist in detecting malingering, concluded defendant was "doing his best on the testing," rather than faking symptoms. In addition, as she pointed out, defendant's normal to excellent performance on many of the tests and consistently poor performance on others was inconsistent with malingering, since he would have had to know on which tests to do well and poorly.

Roger Bertoldi, M.D., a neurophysiologist, testified regarding the occurrence and effect of brain seizures, generically referred to as epilepsy. Some types of epilepsy, in particular temporal lobe epilepsy, can result in a loss of control, leading to acts of violence. A seizure of this type can result in uncontrollable rage. Defendant began suffering seizures before he was three years old. His seizures continued periodically during childhood, leading Dr. Bertoldi to conclude defendant suffered from "true epilepsy," caused by abnormal brain activity. As an adult, Dr. Bertoldi testified, defendant continues to exhibit symptoms of nocturnal seizures. An electroencephalogram (EEG) performed on

12

defendant demonstrated two abnormalities. First, the frontal portion of his brain had "too much slow activity," which showed that this portion of his brain "is not functioning correctly." To this extent, Dr. Bertoldi said, his findings were consistent with those of Dr. Boone. Second, defendant's EEG indicated "paroxysmal activity," periodic spikes of activity that arose and receded, which is also "consistent with underlying brain dysfunction." A computer analysis confirmed the abnormal slow function in the front of defendant's brain, detected in fewer than 1 percent of the population and suggesting defendant suffered from epilepsy. Defendant was prescribed Depakote to control the seizures by limiting the penetration of abnormal activity into his brain. Defendant had told Dr. Bertoldi that prior to the various violent episodes in his life, he had ceased taking the drug. This coincidence, in Dr. Bertoldi's view, connected the violent episodes to an underlying epileptic disorder. In Dr. Bertoldi's experience, epileptic patients commonly describe a sense of disassociation from their conduct at the time of a seizure. He explained that the type of brain dysfunction he observed in defendant can result in "extraordinary rage like a primitive, very primitive rage."

Saul Niedorf, M.D., is a psychiatrist who often worked with the victims and perpetrators of domestic violence. Based on three interviews with defendant during his incarceration and Dr. Niedorf's review of "a dozen" reports on defendant, he concluded defendant suffers from a mental condition known as "intermittent explosive disorder," which is characterized by destructive or violent actions that occur suddenly and lack a "cutoff." Dr. Niedorf based his diagnosis on a number of factors, including (1) defendant's history of neurological abnormalities from an early age, (2) the continued presence of slow brain waves in his recent EEG, which indicated a "failure of development," (3) Dr. Boone's testing, which indicated "the absence of a certain kind of function," and (4) a recent positron emission tomography (PET) scan showing areas of abnormally low

13

activity in defendant's brain, which suggested that his brain lacked the capacity to inhibit his rage once it started. In addition, Dr. Niedorf observed, the harsh facts of defendant's upbringing demonstrated that he was "programmed for violence" by the brutal conduct of an abusive father toward his family members, conduct that defendant internalized. Dr. Niedorf noted that defendant also had a history of suicide attempts, beginning in childhood and continuing through his then-current incarceration, which was consistent with his diagnosis. Further corroborating his diagnosis was defendant's positive response to mood stabilizing medications, which reduce a person's arousal level and prevent excessive agitation. Dr. Niedorf also observed that, beginning in 1993 and continuing to the time of the killing, defendant had been diagnosed repeatedly with a variety of mental disorders, largely depression, bipolar disorder, and schizophrenia.

In Dr. Niedorf's view, defendant met the legal definition of insanity at the time he committed the killing. He neither knew nor understood the nature and quality of his actions at the time he was beating Epperson, existing instead in an altered state of consciousness in which he failed to feel empathy or recognize the significance of his actions. He may have been aware, at the time, of the events occurring, but he was unable to register the emotions associated with the events until later. Nor could defendant distinguish right from wrong because, at the time, the parts of his brain that initiate good behaviors and stop bad behaviors, his frontal and temporal lobes, were not functioning. Given the "practiced" nature of the behaviors, he neither voluntarily initiated them nor had the ability to stop them once they had begun, and he was not conscious of his conduct at the time it occurred.

William Vicary, M.D., a psychiatrist, first evaluated defendant in 1993 and 1994, when he was retained by the court to evaluate defendant's mental competence to stand trial. In connection with the present proceedings, Dr. Vicary

14

had interviewed defendant on five or six occasions, for a total of ten hours. Based on that investigation, he concluded defendant suffered from a "major mental disorder," primarily bipolar disorder. Dr. Vicary believed his conclusion was supported by defendant's psychoactive medication schedule. He said that the medications prescribed for defendant, if given to a normal person, would place him or her in "a semi-coma for a period of three days." That defendant could take the various medications at high doses and remain alert and rational at the time of his testimony demonstrated "that these medications are fitting in with his illnesses and helping him." If defendant were faking his disorder, "he would have been under the influence and barely able to speak." Dr. Vicary explained that bipolar disorder is characterized by alternating periods of moody, irritable, and frenetic activity and periods of depression and inactivity, including attempted suicide. Depression and bipolar disorder had featured in defendant's diagnoses since he was a teenager, and Dr. Vicary found that defendant's conduct displayed the diagnostic behaviors for bipolar disorder.

Based on defendant's account of the Epperson killing, Dr. Vicary believed defendant understood the nature and quality of his acts at the time. He did not believe, however, that defendant could distinguish right from wrong. One feature of bipolar disorder is "explosive outbursts," in which the person is "not thinking, . . . just acting, and . . . there is no rationality, no restraint, there's nothing that can stop the explosion." Although defendant had some understanding of what he was doing, he was unable to stop himself. In Dr. Vicary's view, defendant likely recognized to some degree the wrongfulness of his conduct once he had finished and regained his composure, but during the event he had no grasp of right and wrong.

15

## 2. Prosecution evidence

David Griesemer is a clinical neurophysiologist who studies epilepsy and EEG's. Prior to his testimony, he examined defendant and found his functioning normal. According to Dr. Griesemer, defendant had no memory of suffering seizures after childhood, and about half of persons with childhood seizures "outgrow" them. Defendant's childhood EEG was interesting because, although the EEG was abnormal, he was not suffering symptoms, a finding "not inconsistent with some of the benign epilepsies." In reviewing defendant's most recent EEG, Dr. Griesemer found "some subtle abnormal findings," but "they were not epileptic findings." In other words, although Dr. Griesemer acknowledged the slowing in defendant's EEG, he did not believe it indicated a "tendency to have epilepsy." Further, he did not believe it suggested "significant" frontal lobe slowing.

Kris Mohandie, Ph.D., a psychologist, interviewed defendant on three occasions, reviewed his medical and psychiatric records, and administered two "objective" psychological tests. The results of the tests, in particular, suggested to Dr. Mohandie that defendant was faking at least some of his psychiatric symptoms. On both tests, defendant claimed to have more problems than most psychiatric patients claim, suggesting his responses were a "fake bad response." One test indicated probable feigning, while the other indicated feigning. Given defendant's "tendency to exaggerate his symptoms," Dr. Mohandie was unable to find reliable evidence to diagnose defendant with a major mental disorder. When he interviewed defendant, Dr. Mohandie found no evidence of bipolar disorder, although such symptoms would have been expected despite his medication. Nor did he see any indication of such symptoms on the videotape of defendant's police interview, which occurred after he had stopped using medication.

16

Accordingly, Dr. Mohandie believed defendant was legally sane at the time of the killing. As he explained, in defendant's interviews with him, defendant disclaimed any overt symptoms of mental illness, such as voices, delusions, or hallucinations. He had a very specific memory of all events leading up to the killing, and his behavior after the killing, which involved some cleaning up and avoiding detection, was inconsistent with a failure to recognize his conduct was wrongful. His claim of amnesia surrounding the moment of the killing seemed "unlikely" to Dr. Mohandie. Instead, Dr. Mohandie believed, defendant suffered from an antisocial personality with narcissistic traits, which caused him to commit the "garden variety violence" of killing a woman who he believed had treated him poorly. Dr. Mohandie also rejected the diagnosis of intermittent explosive disorder, which he found inconsistent with the purposeful, motivated behavior displayed in the killing.

## C. Penalty Phase Evidence

### 1. Prosecution case in aggravation

Because the original jury deadlocked during the initial penalty phase, this proceeding was tried to a newly-selected jury. Given the new jury, the prosecution presented essentially the same evidence regarding Epperson's killing that was presented during the guilt phase, including testimony by the same percipient witnesses about the circumstances leading to the killing, the blood spatter, autopsy, and DNA evidence, Charles Vannoy's interview with police about defendant's statements and conduct afterward, and the two prior assault victims.

In addition, the prosecution presented two witnesses familiar with Epperson's life prior to meeting defendant. Bette Ruiz de Esparza is the mother of Paul Grano, who was married to Epperson. She testified that Epperson's mother,

17

apparently an alcoholic, abandoned her when Epperson was a teenager. Ruiz de Esparza and her son took Epperson in, looked after her, and treated her like family. Grano, eight years older than Epperson, eventually married her, and they had a child together. Both Grano and Epperson struggled with drug abuse, and Epperson was in and out of treatment and jail for a significant period. In the year or two before her death, however, Epperson "sounded real positive, and her life was going good." Although Epperson and Grano had separated at some earlier time, "they were getting back together" at the time of her death. During the separation, they had remained good friends, and Grano was "broken-hearted" by her death.

Ruth Steward was a lay minister at Epperson's Church, which was located on "skid row," across the street from Weingart Center. She had known Epperson for about a year prior to her death and was proud of Epperson's strength, positive attitude, and determination. During the year Steward knew her, Epperson was drug-free. Steward was deeply affected by her "senseless" death.

   *2. Defense case in mitigation*

Through the testimony of defendant's mother and two sisters, the defense provided evidence of defendant's difficult family life and history of violence. Both of defendant's parents, Joyce and Joe Powell, came from homes marked by alcohol abuse. Joyce's parents were alcoholics, and her father sexually abused her before she was ten years old. Joe's mother also drank heavily, and he was raised largely in a variety of foster homes. The couple married young.

Defendant's younger sister, Montana, characterized Joe as a "monster." He was emotionally and physically abusive to Joyce and all four children. As Montana said, "If we went to Disneyland or something, he still would find a way to make us feel bad." When defendant was two years old and threw an older boy

18

to the ground, Joe picked defendant up and threw him into a pole. Six months later, defendant began having violent seizures. For seven years, he was given medication to control the seizures. Over the years, defendant's behavior would occasionally trigger other angry responses from Joe, one time causing neighbors to call the police. According to Joyce, similar incidents occurred "every time [Joe] came home and was angry." If Joyce attempted to intervene, Joe turned his anger on her.

The family lived in fear of Joe. Defendant's older brother became so angry with Joe that he once waited with a gun for him to return home, planning to kill Joe. Only his older sister's intervention prevented the confrontation.

Defendant's first suicide threat occurred when he was thirteen years old. Around this time, Joyce said, "he was never actually really happy." His older sister recalled discovering him carrying a gun in a duffel bag, planning to harm either himself or Joe. She talked him out of it.

Defendant's first violent outburst occurred before his eighteenth birthday when, in anger over a girlfriend, he attacked Montana with a lead pipe while she was sleeping. Afterwards, defendant had no memory of the incident. Although Joyce attempted to get him counseling, Joe refused to pay for it. After a bout of drinking when defendant was 22-years old, he became enraged when Joyce told him she had no money to give him, and he threw her across the room, breaking a vertebrae in her back. At some point he also assaulted his older sister when she attempted to rouse him from a drunken stupor, pushing her down the stairs and ripping a mirror from her car. Both Joyce and his sisters testified that defendant would at times go into a state of vacant, uncontrolled rage. As his older sister testified, "It's like he's doing things but he doesn't know he's doing them, but he's doing them."

19

Joyce viewed such conduct as uncharacteristic, testifying that defendant was a "caring and loving person" who was protective of others. They are very close, and she does not fear him. Defendant's older sister also testified that she was close to him and believed he "had a big heart," despite his anger.

In addition to testimony by defendant's family and friends, both childhood and adult, defendant presented the testimony of the same four psychiatric experts who testified during the sanity phase. Although different in some details, the testimony was materially the same.

### 3. Prosecution rebuttal case

In rebuttal, the prosecution also presented the testimony of Drs. Griesemer and Mohandie, which was materially the same as their testimony from the sanity phase.

### 4. Defense surrebuttal

In surrebuttal, the defense presented Richard Romanoff, Ph.D., a clinical and forensic psychologist who had met with defendant for thirteen or fourteen hours. Dr. Romanoff believed defendant suffers from a "complex set of mental disorders," beginning with "organic impairment," or abnormal brain function. This was compounded by the dysfunctional family circumstances during his youth, in which his "whole world [was] organized around fear of aggression and seeing people being victims of aggression." Dr. Romanoff agreed with the diagnosis of intermittent explosive disorder and criticized Dr. Mohandie's contrary view as "incomplete."

## II. DISCUSSION

### A. Guilt Phase Claims

#### 1. The Ireland *merger doctrine does not bar defendant's convictions for torture-murder and mayhem-murder*

The trial court instructed the jury that it could convict defendant of first degree murder either by finding that Epperson's killing was done intentionally with premeditation and deliberation or that it occurred during the commission or attempted commission of, among other charged felonies, mayhem or torture. In *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*), we held that the crime of assault with a deadly weapon cannot be used as the sole predicate crime for a second degree felony-murder conviction because, when a firearm is used in a killing, such an assault is "an integral part of the homicide." (*Id.*, at p. 539.) Defendant contends that the *Ireland* holding, which has come to be known as the " 'merger' doctrine" (*id.*, at p. 540), should be applied here to preclude a verdict of first degree murder in the course of the crimes of mayhem or torture because the commission of these crimes was, in defendant's characterization, an integral part of his brutal heat of passion killing. We find the argument unpersuasive.

" 'The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.' [Citation.] 'Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. If the felony is listed in section 189, the murder is of the first degree; if not, the murder is of the second degree.' " (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

The defendant in *Ireland* was convicted of second degree murder after he shot his wife in the course of an argument in their home. (*Ireland*, *supra*, 70

21

Cal.2d at p. 528.) The jury had been instructed that it could convict the defendant of second degree murder if the killing occurred during the commission of a felony inherently dangerous to human life, expressly including assault with a deadly weapon. (*Id*., p. 538.) In reversing, we concluded, "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault — a category which includes the great majority of all homicides. . . . We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is *an integral part of the homicide* and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*Id*., at p. 539 [first italics added, second italics in original, footnote omitted].)

In two subsequent decisions, we extended this doctrine to preclude convictions for first degree felony murder premised on a killing during the course of a burglary when the intended felony underlying the burglary was the assault that led to the homicide. (*People v. Sears* (1970) 2 Cal.3d 180, 188-189 (*Sears*); *People v. Wilson* (1969) 1 Cal.3d 431, 440 (*Wilson*) [precluding application of the felony-murder rule when "the entry would be nonfelonious but for the intent to commit the assault, and the assault is an integral part of the homicide"].)

Although second degree felony murder is grounded in an interpretation of section 188, no statute specifically addresses second degree felony murder. (*People v. Chun* (2009) 45 Cal.4th 1172, 1182-1183.) In contrast, first degree felony murder, along with the predicate crimes underlying it, is expressly described in section 189. Citing this distinction in *People v. Farley* (2009) 46 Cal.4th 1053 (*Farley*), we reconsidered and disapproved the extension of the merger doctrine to first degree felony murder. As *Farley* reasoned, " ' " 'the power to define crimes and fix penalties is vested exclusively in the legislative

22

branch.' [Citation.]" ' [Citation.]  The courts may not *expand* the Legislature's definition of a crime [citation], nor may they *narrow* a clear and specific definition.  In the context of second degree felony murder, courts must interpret section 188's reference to an ' "abandoned and malignant heart." ' [Citation.]  In the context of first degree felony murder, however, there is no need for interpretation of the Legislature's clear language.  Thus, the differences between the statutory bases for first and second degree felony murder support the conclusion that although this court properly may limit the breadth of second degree felony murder in a manner consistent with its interpretation of the Legislature's intent, there is no room for interpretation when the Legislature has defined first degree felony murder to include any killing 'committed in the perpetration of, or attempt to perpetrate,  . . . burglary.' " (*Id.*, at p. 1119.)

The rationale of *Farley* requires us to reject defendant's argument.  Although *Farley* was concerned with felony murder based on burglary, its rationale applies equally to all of the predicate felonies expressly listed in section 189.  Even prior to *Farley*, we had never applied the merger doctrine to first degree felony murder premised on a predicate crime other than burglary.  (See *People v. Gonzales* (2011) 51 Cal.4th 894, 942 ["our preexisting jurisprudence had limited *Wilson* to cases of burglary felony murder where the defendant's only felonious purpose was to assault or kill the victim"].)  We have declined to apply *Farley* to cases involving convictions for first degree felony murder premised on burglary that were committed prior to the issuance of that decision in order to avoid retroactivity concerns (*People v. Covarrubias* (2016) 1 Cal.5th 838, 882; *Farley*, *supra*, 46 Cal.4th at p. 1121), but there is no risk of an ex post facto violation in the circumstances presented here.  Because we have never suggested that the merger doctrine applies to murders premised on torture and mayhem, precluding that application on the rationale of *Farley* does not constitute "an

23

unforeseeable judicial enlargement of a criminal statute." (*Farley*, at p. 1121; *People v. Blakely* (2000) 23 Cal.4th 82, 91 ["an unforseeable judicial enlargement of a criminal statute, applied retroactively, operates in the same manner as an ex post facto law"].) Given the absence of any indication in our prior decisions that first degree murder premised on torture or mayhem is subject to the merger doctrine, and given our failure to extend the doctrine, over the course of thirty years at the time of defendant's crimes, to any first degree felony murder other than one premised on the type of burglary involved in *Sears* and *Wilson*, our refusal to extend the doctrine to torture and mayhem is not a legal result " 'that the accused could not have foreseen at the time of the alleged criminal conduct.' " (*People v. Whitmer* (2014) 59 Cal.4th 733, 742.) Accordingly, we hold that defendant's argument fails because the merger doctrine is inapplicable to first degree felony murder.

### 2. *The evidence was sufficient to support defendant's conviction for torture murder*

Defendant contends there was insufficient evidence before the jury to support the torture conviction, the first degree torture-murder conviction, and the special circumstance finding based on that theory.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).) In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard of review applies to the sufficiency of the evidence

24

supporting special circumstance findings.  (*People v. Chatman* (2006) 38 Cal.4th 344, 389.)

" 'All murder which is perpetrated by means of . . . torture . . . is murder of the first degree.'  (§ 189.)  Murder by torture requires (1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent."  (*People v. Edwards* (2013) 57 Cal.4th 658, 715-716 (*Edwards*).)  The elements of a torture-murder special circumstance (§ 190.2, subd. (a)(18)) are similar but not identical.  "To prove that special circumstance allegation, the prosecution had to establish that 'defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' "  (*People v. Brooks* (2017) 3 Cal.5th 1, 65 (*Brooks*).)

In a sufficiency of the evidence challenge to a torture-murder conviction or special circumstance finding, the focus is generally on "defendant's torturous intent."  (*Brooks*, *supra*, 3 Cal.5th at p. 65.)  The perpetrator must intend to " ' "cause pain and suffering in addition to death." ' "  (*Edwards*, *supra*, 57 Cal. 4th at p. 716.)  Torturous intent " 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.' "  (*People v. Smith* (2015) 61 Cal.4th 18, 52.)  In this regard, "evidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite ' "sadistic intent to cause the victim to suffer pain in addition to the pain of death." ' "

25

(*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1188.)  Such wounds support a finding of intent because they "evidence[] deliberate and gratuitous violence beyond that which was necessary to kill the victim."  (*Ibid.*)  The focus, as noted, is on defendant's *intent* to inflict pain and suffering, which is "at the heart of" torture murder.  (*People v. Davenport* (1985) 41 Cal.3d 247, 268 (*Davenport*).)  It need not be demonstrated that that the victim was actually conscious and suffered pain at the time otherwise painful injuries were inflicted.  (*Brooks*, *supra*, 3 Cal.5th at p. 67.)

Our most recent decision addressing the evidence necessary to support a torture-murder conviction is *Brooks*, in which we affirmed both a torture-murder conviction and special circumstance finding.  The defendant in *Brooks* developed a jealous, possessive attitude toward the victim, with whom he was having a romantic affair.  (*Brooks*, *supra*, 3 Cal.5th at pp. 17, 66.)  He came to believe she was having a sexual relationship with another man and began spying on her.  One day after she left that man's home, the defendant confronted her, strangled her into unconsciousness, placed her in her car, and, aware that she was still alive, set her and the car on fire.  (*Id.*, at p. 66.)  We concluded that "a reasonable jury could infer from evidence of defendant's intense possessiveness and all-consuming suspicions . . . , coupled with his dousing her and her car with accelerant and lighting them on fire, that defendant intended to inflict severe pain on [the victim] for the purpose of revenge."  (*Id.*, at pp. 66-67.)

In this case, the jury could have concluded that defendant became similarly obsessed with Epperson, thereby satisfying the "purpose" element of torture murder.  He told Todd that he loved her and said "If I can't have her, nobody will, I'll kill her and myself."  He was concerned that she might be seeing other men, began to appear uninvited at her place of work, and telephoned her persistently.  By defendant's own testimony, the immediate cause of the assault on Epperson

26

was a phone call that she took from another man, whom she refused to identify, during which she made social plans. When this caused an argument, Epperson told defendant they were "done." Feeling "crushed," he hit her. As related earlier, defendant told Charles Vannoy that he instructed Epperson to sit on the toilet and then hit her with a candle holder. As he began beating her, Epperson asked why he was doing it. He told her, "All I wanted you to do was to love me, you know, and you wouldn't do that." Accordingly, defendant's own account of the killing, as well as the circumstances surrounding the crime, provide substantial evidence to support a finding that his purpose in assaulting her was revenge for Epperson's romantic rejection.

The testimony and forensic evidence further demonstrated that defendant engaged in far more violence than that necessary to kill Epperson, some of it unrelated to any attempt to kill, which provided substantial evidence to support a finding that he intended to inflict extreme and prolonged pain. The beating alone was savage and beyond that necessary to cause death. Defendant struck Epperson repeatedly in the bathroom, carried her into the living room, and then beat her with several different objects, striking with such force that each item was broken into pieces and flattening the features of her face. In addition, he used broken glass to inscribe cuts into both sides of her neck and the left side of her face and drove a screwdriver or ice pick into her face. Finally, defendant inflicted wounds to Epperson's vaginal area of a severity the coroner found to be "very rare[]." While some vaginal injury might be expected from a rape, the injuries inflicted on Epperson were extreme, suggesting an intent to inflict suffering beyond that caused by the violation of rape. As the coroner testified, the majority of these injuries, perhaps as much as 95 percent, occurred while Epperson was still alive.

In short, there was substantial evidence from which a reasonable jury could have concluded that defendant, motivated by revenge for Epperson's rejection of

27

him as a romantic partner, chose to inflict extreme pain and suffering on her, causing the dreadful injuries from which she eventually died.[3]

The same evidence supports the jury's true finding of the special circumstances allegation, which requires an intent to kill and an intent " 'to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*Brooks*, *supra*, 3 Cal.5th at p. 65.)  Defendant's own statements to Vannoy and the extreme nature of the beating provide adequate evidentiary support for a finding of intent to kill.

Defendant properly argues that the severity of Epperson's wounds cannot be the sole evidence to support a finding of torturous intent.  (See, e.g., *People v. Gonzales* (2012) 54 Cal.4th 1234, 1273 ["Horrible wounds may be as consistent with a killing in the heat of passion or an explosion of violence, as with the intent to inflict cruel suffering"].)  But it is not so much the *severity* of Epperson's wounds, as their *nature*, that supports a finding of intent to inflict pain and suffering here.  Defendant used three separate heavy objects to bludgeon Epperson, discarding each in turn as it broke into pieces, and presumably continued the beating long after she was rendered unconscious.[4]  He gratuitously cut both sides of her face and drove a sharp object into it, and inflicted severe injuries to the area around her vagina.  The nonfatal but undoubtedly painful

---

[3]    Defendant concedes that if the intent element of torture murder is supported by the evidence, his conviction for torture, apart from torture murder, is supported by the evidence.

[4]    Defendant contends there is no reason to believe these objects were used "in so skillful a manner as to deliberately impose pain and suffering — but not death," but there is no requirement that a defendant calculate each of his or her blows so as to cause suffering without death.

28

injuries, particularly, evidenced an intent to inflict pain apart from an inevitably fatal beating.

Defendant also argues the evidence was consistent with a killing due to an " 'explosion of violence' " (*Davenport*, *supra*, 41 Cal.3d at p. 268), rather than an intent to torture. He cites *People v. Anderson* (1965) 63 Cal.2d 351 (*Anderson*), in which the defendant killed a young girl who may have resisted an attempted sexual assault. The manner of the homicide — the infliction of more than 40 knife wounds — was certainly consistent with an intent to inflict pain and suffering (*id*., at p. 355), but the court found insufficient evidence to support a conviction for torture murder. The court explained that the record lacked sufficient evidence of "the requisite intent," but its subsequent discussion made clear that the term "intent" in that phrase refers to purpose or motive — that is, the infliction of pain and suffering "for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*Edwards*, *supra*, 57 Cal.4th at pp. 715, 723.) Because there was no evidence to suggest the *Anderson* defendant had a proscribed purpose in inflicting the wounds, the court held, "the instant case shows only an explosion of violence." (*Anderson*, at p. 360.) A similar result was reached in *People v. Mungia* (2008) 44 Cal.4th 1101, in which the Attorney General "d[id] not contend that defendant was motivated by revenge, extortion, or persuasion" and sought to demonstrate a " ' "sadistic intent to cause the victim to suffer pain in addition to the pain of death" ' " merely on the basis of the defendant's delivery of repeated blows to the victim's head. (*Id*., at p. 1136.) In that case we found insufficient evidence to support a torture-murder special circumstance, concluding "[t]he killing was brutal and savage, but there is nothing in the nature of the injuries to suggest that defendant inflicted any of them in an attempt to torture [the victim] rather than to kill her." (*Id.*, at p. 1137.)

That is simply not the case here. First, there was substantial evidence from which the jury could reasonably have found that defendant was motivated by revenge, beginning with his acknowledgment that he first struck Epperson because she had terminated their relationship. Second, as discussed above, defendant's infliction of gratuitous injuries in addition to the fatal beating provided substantial evidence of an intent to inflict pain and suffering for their own sake.[5]

### 3. *The evidence was sufficient to support defendant's conviction for rape-murder*

Defendant contends there was insufficient evidence to support the rape conviction, the rape-murder theory of first degree felony murder, and the special circumstance finding based on that theory.

A homicide "committed in the perpetration of, or attempt to perpetrate . . . rape" is first degree murder. (§ 189; *People v. Berryman* (1993) 6 Cal.4th 1048, 1086.) Forcible rape is "an act of sexual intercourse accomplished . . . [¶] . . . [¶] . . . against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2); *People v. Harris* (2013) 57 Cal.4th 804, 850.) A rape-murder special-circumstance finding requires the homicide to be committed while the defendant was engaged in the commission of, or attempted commission of, rape. (§ 190.2, subd. (a)(17)(C); *People v. Lewis* (2009) 46 Cal.4th 1255, 1292 (*Lewis*).)

---

[5] Defendant also cites *People v. Leach* (1985) 41 Cal.3d 92, in which we reversed a torture-murder special-circumstance finding because the jury was not instructed that intent to inflict pain and suffering was an element of the finding. (*Id.*, at pp. 109-110.) We declined to affirm in spite of the error because the evidence did not demonstrate intent to inflict pain " 'as a matter of law,' " noting the "strong evidence of intent to kill militates to some extent against a finding of intent to inflict pain." (*Id.*, at p. 110.) Because the jury was properly instructed here, the evidence need not demonstrate intent to inflict pain as a matter of law. *Leach* has no application.

As noted above, we review the jury's verdict for substantial evidence. (*Lindberg*, *supra*, 45 Cal.4th at p. 27.)

There was substantial evidence of forcible rape here. Defendant's DNA was found in a vaginal swab, and his sperm was found in and outside Epperson's vagina. When her body was discovered, Epperson was still wearing a sweatshirt, blouse, and bra on her upper body, but her lower body was nude, a pattern consistent with forced intercourse. (*Lewis*, *supra*, 46 Cal.4th at p. 1290.) In addition, her brassiere had been pushed above her nipples. Blood stains on her jeans, which were found lying near her body, suggested that defendant had, with bloody fingers, unbuttoned the pants, put his hands inside the pockets, and pulled the pants off, and the blood stains on the inner surface of Epperson's thighs were consistent with the forcing apart of her legs. The medical examiner found the degree of trauma to Epperson's vaginal area "very rare[]," caused by "the blunt force penetration either by a penis with a lot of force or other kind of object of similar shape and size." From these facts, the jury readily could have concluded, beyond a reasonable doubt, that Epperson had forced intercourse and that her death occurred while defendant was engaged in this rape.

Defendant's argument to the contrary focuses on the fact that Epperson's jeans were found lying on top of her panties, the reverse of what would be expected if defendant had removed her clothing, and the testimony of a defense forensic expert who examined a liner in the panties and concluded it was likely she had not worn them. This evidence, defendant argues, suggests that Epperson was not wearing clothing on her lower body at the time the assault began. Defendant's interpretation of the forensic evidence, however, fails to account for the unusual blood stains on her jeans, which suggest that they were removed after both Epperson and defendant had been bloodied. If she were not wearing jeans at the time of the assault, there would be no explanation for the blood stains in her

31

pockets. It may simply be that Epperson was wearing the jeans without underwear, a circumstance that would also explain how the jeans ended up on top of the panties. Defendant's interpretation also ignores the pattern of blood stains on her thighs and the severe trauma to her genitals. In any event, that Epperson might not have been clothed from the waist down is not inconsistent with a forcible rape.

Noting that he testified to having had voluntary intercourse with Epperson prior to the assault, defendant argues that Epperson's vaginal trauma could have been the result of consensual sexual intercourse between a relatively small woman and a very large man.[6] It is unlikely, however, that Epperson would willingly have endured intercourse that caused vaginal injury as severe as that found by the medical examiner. In any event, the totality of the evidence provides substantial evidence of rape, notwithstanding the possibility of an alternate explanation.

Defendant contends these circumstances are comparable to those in *People v. Craig* (1957) 49 Cal.2d 313 (*Craig*), and *Anderson*, *supra*, 70 Cal.2d 15, in which the evidence was found insufficient to support first degree felony-murder convictions based on rape. Both cases are distinguishable. In *Craig*, the victim had been beaten to death. When found, her body was dressed in a slip or nightgown, covered by a raincoat. Her panties, which had been found underneath the body, were torn open. (*Id*., at p. 316.) Yet the court in *Craig* found insufficient evidence to support a rape-murder conviction because, notwithstanding the suggestive condition of the victim's clothing, neither the defendant's nor the victim's clothing "bore any evidence of the sexual act" (*id*., at p. 318), and there was no other evidence to suggest sexual intercourse had

---

**6** At the time of the killing, defendant was between 6 feet, three inches and 6 feet, four inches tall and weighed about 280 pounds.

32

occurred. (*Ibid.*) In *Anderson*, as noted above, the victim had been stabbed to death. Her body was nude, and the crotch had been cut from her underwear. (*Id.*, at pp. 20-21.) Again, the court found insufficient evidence to support a charge under section 288 of lewd and lascivious conduct with a child under the age of 14 years because there was no physical evidence of sexual contact or any evidence that the defendant harbored sexual feelings toward the victim or had ever engaged in lewd conduct with her. (*Id.*, at pp. 35-36.) In contrast with these cases, the state of Epperson's clothing was not the only evidence supporting the charge of rape. As discussed above, there was no question defendant had sexual intercourse with Epperson, and there was substantial forensic evidence to support the charge that the intercourse had occurred by force and against her will.[7]

### 4. *The trial court's admission of gang affiliation evidence during the guilt phase was harmless*

Defendant contends the trial court committed prejudicial error in permitting the introduction of evidence during the guilt phase that he had been affiliated in prison with a white supremacist gang and that he had tattoos suggesting racist sympathies. He also argues that the prosecutor committed misconduct in eliciting some of this evidence.

Epperson was Caucasian. Around the time she met defendant, Epperson had broken off her romantic relationship with Sims, an African-American, but the

---

[7]    Defendant also contends his conviction for premeditated first degree murder was not supported by substantial evidence. Because we have concluded that substantial evidence supports defendant's first degree murder conviction on the theories of torture murder and rape murder, and because defendant has not challenged the sufficiency of the evidence supporting the theory of mayhem-murder, we need not, and do not, address the sufficiency of the evidence supporting the charge of premeditated first degree murder. (See *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1192, fn. 20.)

two remained friends, and defendant was aware of their relationship. On the morning of the day Epperson was killed, defendant saw her talking to Sims outside her church.

Although Sims and defendant had lived in the same building during two years of rehabilitation, they had never formally met or spoken. When Sims testified that he felt "intimidated" by defendant because defendant was a "white supremacist," the trial court struck this testimony and admonished the jury to disregard it. Timothy Todd, Epperson's friend and assistant at her workplace, later testified, without objection, that defendant, "on several occasions," said that "he would kill that nigger [Sims] if he kept trying to see" Epperson.

During the cross-examination of defendant, he acknowledged, without explanation, that he "had a problem" with Sims because of "what he did to" Epperson. When defendant denied being a "racist" and disliking Sims because he was an African-American, the prosecutor was permitted to introduce, over objection, photographs of defendant's tattoos, two of which read, "White Pride" and "White Anger." Defendant said he had gotten the tattoos "years ago" in prison.

During the prosecution's rebuttal case, the trial court permitted the introduction of gang-related statements made by defendant's friend, Charles Vannoy, during his police interview. The jury therefore heard Vannoy describe himself as a one-time member of the Aryan Brotherhood, although he had since left the group. Vannoy acknowledged having tattoos, one of which was a swastika, and said he was aware defendant did not like Sims, whom the interviewer had referred to as Epperson's "Black boyfriend." In closing argument, neither attorney mentioned the tattoos or gang evidence.

We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that

34

the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Covarrubias* (2016) 1 Cal.5th 838, 887-888 (*Covarrubias*) [*Watson* standard applies in evaluating prejudice from state law error in admitting evidence].) We apply a similar standard of prejudice when considering a claim of prosecutorial misconduct. (E.g., *People v. Peoples* (2016) 62 Cal.4th 718, 798-799, 804.)

We need not address the propriety of the trial court's admission of this evidence or the prosecutor's conduct in eliciting it during the guilt phase because any error in its admission was harmless. The evidence of defendant's guilt was very strong. There was no question that he was the killer. The forensic evidence powerfully revealed the manner of Epperson's death, and the testimony, including defendant's own testimony, provided ample evidence of the obsession that appears to have motivated the crimes. At most, the evidence of defendant's possible racist sympathies would have provided an additional reason for the intensity of his anger at the time of the killing. Defendant's gang membership was therefore largely irrelevant to the issues before the jury in the guilt phase, and any negative reaction the jurors might have had to the gang evidence would not have had a significant influence on their evaluation of the evidence.

Nor do we conclude, for similar reasons, that any misconduct by the prosecutor in eliciting this testimony "infect[ed] the trial with such unfairness as to make the conviction a denial of due process." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331.)

Defendant argues admission of the evidence was "inherently prejudicial" because it created a risk the jury would improperly infer defendant has a criminal disposition and is therefore guilty of the offense charged, citing *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*).  Whether defendant had a "criminal disposition" was rendered moot by the strength of the evidence bearing on his guilt.  Concerns about the possible "inflammatory impact" of this type of evidence (*id.*, at p. 193) were similarly alleviated by the nature of the evidence of defendant's guilt.[8]

> 5. *The special circumstance findings of torture murder and mayhem murder are supported by the evidence*

Defendant argues that the jury's torture-murder and mayhem-murder special-circumstance findings were not supported by sufficient evidence because he had no "independent felonious purpose" in committing the predicate crimes. (*People v. Green* (1980) 27 Cal.3d 1, 61 (*Green*.)  According to defendant, the acts of torture and mayhem were, in effect, a means to the end of killing Epperson, rather than ends in themselves.[9]

The requirement of an independent felonious purpose applies to felony-murder special-circumstance findings under section 190.2, subdivision (a)(17). (*People v. Coffman and Marlow* (2004) 34 Cal 4th 1, 87.)  This subdivision authorizes a special circumstance finding when the murder "was committed while

---

**8**    We also reject defendant's contention that the introduction of this evidence in the guilt phase violated his right to due process, since any error in the admission of this evidence was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

**9**    Although a heading in defendant's brief asserts that this argument is addressed to "all" of the special circumstance findings, he concedes in a footnote that the argument actually applies only to the torture-murder and mayhem-murder special-circumstance findings.

36

the defendant was engaged in . . . the commission of [or] the attempted commission of " various other specified felonies. (§ 190.2, subd. (a)(17).) Section 190.2 was enacted in response to United States Supreme Court decisions requiring that a jury's discretion in imposing the death penalty be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (*Gregg v. Georgia* (1976) 428 U.S. 153, 189; *Green*, *supra*, 27 Cal.3d at p. 61.) With respect to the felony-murder special circumstances, *Green* explained that the Legislature found it appropriate for the jury to consider a penalty of death when a defendant "killed in cold blood in order to advance an independent felonious purpose." (*Id*., at p. 61.) The Legislature's goal, *Green* concluded, would not be achieved "when the defendant's intent is not to [commit the predicate felony] but to kill and the [predicate crime] is merely incidental to the murder . . . because [the predicate crime's] sole object is to facilitate or conceal the primary crime," i.e., the murder. (*Ibid*.) In the intervening years, these phrases from *Green*, "independent felonious purpose" and "merely incidental," have become talismanic, but they remain useful concepts that give meaning to the statutory requirement that the murder occurred "in the commission of" the predicate felony. They are not separate and independent requirements for a felony-murder special circumstance. (*Brooks*, *supra*, 3 Cal.5th at p. 117.)

Although defendant raises this claim with respect to both the torture-murder and mayhem-murder special-circumstance findings, we have never required an independent felonious purpose to support a special-circumstance finding for torture murder. From its inception, section 190.2 has codified the special circumstance for a murder involving torture separately from the felony-murder special circumstances. (See *Green*, *supra*, 27 Cal.3d at p. 49.) At the time of defendant's crimes, as today, the felony-murder special circumstances were codified in section 190.2, subdivision (a)(17). A different subdivision defines the

37

torture-murder special circumstance, permitting the finding when "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) Because subdivision (a)(18) lacks the requirement that the murder be committed while the defendant was "engaged in . . . the commission of" torture, the requirement of an independent felonious purpose, which implements this language, does not apply to a torture-murder special circumstance. Defendant provides no reason for questioning this conclusion, which follows directly from the statutory language. His argument therefore provides no basis for challenging the sufficiency of the evidence to support the torture-murder special-circumstance finding.

The jury also found true the mayhem-murder special circumstance allegation, which is specified in Section 192, subdivision (a)(17). Mayhem requires, in very general terms, the intentional infliction of a maiming or disfiguring injury. (See *People v. Santana* (2013) 56 Cal.4th 999, 1004-1005; §§ 190.2, subd. (a)(17)(J), 203.) Defendant has not challenged the sufficiency of the evidence to support his conviction for the crime of mayhem, and we have no reason to question the jury's conclusion that, in the course of his assault, defendant intentionally inflicted disfiguring injuries on Epperson.[10] In convicting defendant of the underlying crime of mayhem, the jury necessarily found that defendant possessed the specific intent to disfigure Epperson, which would have been independent of any intent to kill her. This independent purpose to disfigure

---

[10] The superfluous ragged gashes in Epperson's neck, at a minimum, would qualify as intentional disfigurement. (See *People v. Newble* (1981) 120 Cal.App.3d 444, 447, 449-450 [infliction of three-inch facial laceration likely to leave a permanent scar constitutes mayhem].)

38

provided adequate evidentiary support for the mayhem-murder special-circumstance finding.

Defendant argues that he elected a particularly brutal method of murdering Epperson and his infliction of disfigurement upon her was an incidental consequence of his chosen manner of killing. Whether defendant simply used a brutal means to kill Epperson, or whether his brutality was part of an independent design to commit mayhem, was a factual determination for the jury to make. As discussed above, in convicting defendant of the underlying crime of mayhem, the jury necessarily found that defendant did possess that independent design.

According to Charles Vannoy, at some point during the beating defendant admitted to Epperson that he planned to kill her. We have repeatedly held, however, that a defendant's possession of the intent to kill concurrently with the intent necessary to support a predicate felony does not necessarily render commission of the predicate felony incidental to the murder. As explained in *People v. Castaneda* (2011) 51 Cal.4th 1292, " 'a jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary," but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder.' " (*Id.,* at pp. 1326-1327; see also, *People v. Davis* (2009) 46 Cal.4th 539, 609 ["even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible felony will support the special circumstance allegation"].) Evidence that defendant intended to kill Epperson at the time he committed mayhem did not preclude the jury from finding true the mayhem-murder special-circumstance allegation.

**B. Sufficiency of the Evidence Supporting the Jury's Verdict at the Sanity Trial.**

Defendant contends the jury's finding that he was sane at the time of the killing must be reversed because "the evidence of insanity was of such weight and quality that a jury could not reasonably reject it."

"Under California's statutory scheme, '[p]ersons who are mentally incapacitated' are deemed unable to commit a crime as a matter of law. (§ 26, par. [2].) Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b). (*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; *People v. Phillips* (2000) 83 Cal.App.4th 170, 173; see Stats. 2007, ch. 31, § 5, pp. 138–139.) Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed."[11] (*People v. Elmore* (2014) 59 Cal.4th 121, 140.)

In a sanity trial, the burden is on the defendant to prove insanity by a preponderance of the evidence. (§ 25, subd. (b); *People v. Hernandez* (2000) 22 Cal.4th 512, 521.) A defendant "may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard." (*People v. Mills* (2012) 55 Cal.4th 663, 672.)

---

[11] Section 25, subdivision (b), enacted by Proposition 8 in 1982, actually states that a person can be found insane only if "he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense." (italics added.) In *People v. Skinner* (1985) 39 Cal.3d 765, we held that Proposition 8 was intended to embody the traditional *M'Naghten* test, which holds that insanity is demonstrated if a defendant was unable to understand the nature and quality of the criminal act *or* to distinguish right from wrong when the act was committed. (*Id*., at p. 777.)

## 1. A finding of sanity is subject to the substantial evidence standard of review

Before we address defendant's sufficiency of the evidence argument on its merits, it is necessary to settle the standard of review. Defendant's argument, that the jury's sanity determination must be reversed because the expert evidence he presented "was of such weight and quality that a jury could not reasonably reject it," is based on a misreading of *People v. Drew* (1978) 22 Cal.3d 333 (*Drew*). In that case, we adopted an alternative to the *M'Naghten* sanity test, a decision that was subsequently abrogated by the electorate with the 1982 passage of Proposition 8, which re-adopted the *M'Naghten* test. (See *People v. Skinner* (1985) 39 Cal.3d 765, 768-769.) In changing the sanity test in *Drew*, we also recognized that the defendant was entitled to review of the jury's finding that he was sane under the *M'Naghten* standard, the standard prevailing at the time. (*Drew*, at p. 349.) As we noted, "Defendant Drew argues that even under the M'Naghten test the jury's finding of sanity is not supported by substantial evidence. If Drew should prevail in this contention, he would be entitled to an order directing the trial court to find him insane, thus avoiding a retrial of the case" under the newly adopted test. (*Ibid.*) In undertaking a review of the jury's finding, we confirmed, quoting *People v. Wolff* (1964) 61 Cal.2d 795, 804, that the applicable standard of review was substantial evidence. (*Drew*, at p. 350.)

The only evidence introduced at the sanity trial of *Drew* was the testimony of two court-appointed psychiatrists, both of whom opined that defendant was insane under *M'Naghten*. The prosecution presented no evidence at all. (*Drew*, *supra*, 22 Cal.3d at pp. 338-339, 350.) In arguing for reversal of the finding of sanity, the defendant relied on the unchallenged unanimity of expert opinion. We explained, however, that a finding of sanity could be upheld even "in the face of contrary unanimous expert opinion." (*Id.*, at p. 350.) Because the defendant has

41

the burden of proof, "if neither party presents credible evidence on that issue the jury must find him sane." (*Id.*, at p. 351.) When no affirmative evidence of sanity has been presented, we held, "the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding [i.e., the unanimous expert opinions] is of such weight and character that the jury could not reasonably reject it." (*Id.*, at p. 351.) For reasons the decision explained, the value of both experts' evaluations could be questioned, permitting the jury to reasonably reject both. Accordingly, *Drew* affirmed the finding of sanity. (*Ibid.*)

As the foregoing suggests, the *Drew* standard, focusing the substantial evidence inquiry on the "weight and character" of the expert opinions of insanity, arose in the context of a sanity trial in which the expert evidence of insanity was uncontested, and we have applied *Drew*'s articulation of the standard only in that specific context. Most recently, in *In re R.V.* (2015) 61 Cal.4th 181, we were required to determine the standard of review for a finding of competency to stand trial in a juvenile wardship proceeding. (*Id.*, at p. 199.) We determined that the appropriate standard was "the deferential substantial evidence standard" (*id.*, at p. 200), but we noted that "[t]here is . . . no single formulation of the substantial evidence test for all its applications." (*Ibid.*) Because the only evidence bearing on the juvenile's competence was provided by a defense expert, we applied the *Drew* standard for substantial evidence, noting it was the appropriate standard "in a case such as this one, in which the evidence before the court consists of the opinion of a qualified expert . . . and the materials on which the expert relied." (*Id.*, at p. 203.)

Here, the evidentiary record is considerably more complex, consisting of the testimony of several expert witnesses for each side. We have been provided with no justification for departing, in these circumstances, from the most common

formulation of the substantial evidence test, in which the appellate court reviews the entire record in the light most favorable to the jury's determination and affirms that determination if it is supported by evidence that is "reasonable, credible and of solid value." (*People v. Dunkle* (2005) 36 Cal.4th 861, 885.) This is the standard of review applied to a jury finding of competency to stand trial, an analogous inquiry in which the defendant bears the burden of proof by a preponderance of the evidence. (*Ibid.*; *People v. Marshall* (1997) 15 Cal.4th 1, 31.) We therefore hold that a jury's finding of sanity will be affirmed if it is supported by evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence.

### 2. *The evidence was sufficient to support the jury's finding that defendant was not insane at the time of the killing*

Having determined the appropriate substantial evidence test to be applied in these circumstances, we have no difficulty in finding substantial evidence to support the jury's finding that defendant was legally sane at the time he committed the murder. Although one of the prosecution's experts, Dr. Griesemer, found some slowing in defendant's EEG test, he did not believe it indicated organic deficiencies and concluded defendant's functioning was normal. Dr. Mohandie, the prosecution's other expert, believed defendant was feigning at least some of his psychiatric symptoms. He also found no evidence that defendant suffered from bipolar disorder, as testified by the defense experts. In Dr. Mohandie's view, some symptoms of the disorder would have been expected despite defendant's medication, yet, as he noted, defendant disclaimed symptoms of mental illness, such as voices, delusions, or hallucinations. Dr. Mohandie found the defense experts' diagnosis of intermittent explosive disorder inconsistent with the purposeful behavior displayed in the killing. Based on his observations, Dr.

43

Mohandie believed defendant was aware of the nature of his actions at the time of the killing and could distinguish right from wrong. These experts' testimony suffices to support the jury's finding of sanity.

Further, although the testimony of defendant's experts provided strong evidence that defendant suffered from mental or emotional disabilities, that is not the same as legal insanity, and their testimony was less clear in demonstrating the elements of insanity. For example, the defense experts were unified in suggesting that defendant was unable to control his conduct as a result of mental defects. Merely because a person finds it difficult or impossible to control his or her behavior, however, does not necessarily mean that the person lacks the ability to understand the nature and quality of that behavior or to distinguish right from wrong. On the latter issues, the defense experts were less unified, and the evidence supporting their conclusions was less compelling.

Defendant's claim of insufficiency of the evidence is based on a detailed comparison of the testimony of his own experts with that of Drs. Griesemer and Mohandie, which, he contends, demonstrates that the prosecution experts failed to account for all of the various factors that were cited by the defense experts. The issue of legal sanity is, of course, a complex and uncertain one about which fully competent experts can reasonably disagree. While their testimony might not have revealed that Drs. Griesemer and Mohandie took into account all of the matters raised by the defense, we are satisfied by their qualifications and the nature of their testimony that their opinions were of sufficient quality that the jury could rely on them in finding defendant sane. Nothing more is required to constitute substantial evidence.

44

### C. Penalty Phase Issues

#### 1. *The trial court did not err in admitting evidence of defendant's possible gang affiliation and racist beliefs*

As noted *ante*, part A.4, defendant argues that the trial court committed prejudicial error in admitting evidence of his racist tattoos and gang membership. We discuss the admission of gang-related evidence separately for the guilt and penalty phases because they were tried to different juries and the exact nature of the evidence introduced at the two proceedings differed. The penalty phase jury was unaware of, and therefore unaffected by, the tattoo and gang membership evidence introduced in the guilt phase.

Prior to the second penalty phase trial, the defense sought to exclude evidence of defendant's tattoos. The court acknowledged that the contemplated gang-related evidence was "dangerous" and asked the prosecution to justify its admission. The prosecutor responded that defendant had seen Sims and Epperson together on the morning of the killing and could have believed they were getting back together. Racial animus, the prosecutor claimed, could have been "the spur, the additional spur that caused the defendant to murder her and to torture her. That's the People's theory."

The court agreed with the prosecutor and declined to exclude the evidence, explaining, with regard to the tattoos, "This isn't somebody else's opinion that he's a racist. He puts this on himself. . . . [T]hat this white woman, the victim in the case, was interested in an African-American man, would make a racist very angry." Racial animus, the court believed, might explain the extreme nature of defendant's rage, expressed in the savage beating of Epperson. As the court summarized its thinking, evidence of the tattoos "goes to the motivation and explosive nature of his conduct at the time of the crime."

45

When called to testify, Charles Vannoy, defendant's friend, confirmed that he had both a swastika tattoo and a lightning bolt tattoo and that lightning bolts are a "sign" of the Aryan Brotherhood. Vannoy, however, denied affiliation with the Aryan Brotherhood. When the prosecutor asked, "Isn't it true that you and [defendant] belong to . . . ," she was stopped in mid-sentence by an objection, which was sustained. Soon after, the prosecutor noted that defendant told Vannoy that Epperson's ex-boyfriend was an African-American and asked whether Vannoy saw "any significance to saying that the boyfriend was black." Defense counsel objected, and the prosecutor withdrew the question after being persuaded that the detective interviewing Vannoy, rather than defendant, had brought up Sims's race. No admonishment was requested or given.

As in the guilt phase, Timothy Todd, Epperson's friend and assistant, testified that defendant told him, "if [Sims] kept pursuing [Epperson], he would kill [Sims]." An objection was sustained to the prosecutor's follow-up inquiry whether defendant had used a "racial epithet" when he made the threat, but not before Todd confirmed that an epithet had been used. Counsel did not request that the answer be stricken. Todd was thereafter allowed to testify, over objection, that in the year 2000, defendant told Todd he belonged to a "white gang." Although Todd did not recall which gang, he said, "Well, I know there's several white gangs. There's the LRL, Aryan Nations, gangs like that."

Sims testified that while he was together with defendant in a rehabilitation program, Sims did not know defendant well and avoided him. Over objection, Sims was permitted to testify that he avoided defendant because defendant had tattoos on his calves and arms, without describing the tattoos. Sims also testified that on four separate occasions defendant had engaged in intimidating conduct with him, although he described only one incident, when defendant swore at Sims as he was entering the Weingart Center.

46

When the defense presented the testimony of an African-American friend of defendant, whom he had met at the Weingart Center, the prosecutor asked the witness whether she was aware of defendant's tattoos, without describing them. The witness said she had seen the tattoos and was not bothered by them, again without any express indication of their content. Defendant's mother, Joyce, testified that defendant's father was a "bigot, . . . major big time," but she said that defendant had not "picked up on that." Joyce confirmed that she was aware of defendant's prison tattoos, but when the prosecutor suggested the tattoos were "associated with, for want of a better word white supremacist," Joyce said she "didn't know that, no, I did not."

In closing argument, the prosecutor never raised the possibility that Epperson's killing was related to Sims or his race.

As the foregoing indicates, the evidence of defendant's alleged gang membership admitted during the penalty phase was limited. Vannoy testified about his tattoos and denied gang membership, but he was prevented from testifying about defendant's gang membership. Todd testified that defendant claimed to have belonged to a white gang and had used a racial epithet in speaking about Sims. Sims confirmed that he felt threatened by defendant, without expressly attributing his discomfort to perceived racism. Two African-American witnesses acknowledged an awareness of defendant's tattoos, but neither described them; only the fact that the topic arose during the testimony of African-American witnesses hinted at their content. When the prosecutor eventually attempted to suggest to defendant's mother that the tattoos related to racist sympathies, his mother denied it. And, as noted, none of this featured in the prosecutor's closing argument.

Evidence of a defendant's racist beliefs is inadmissible in the penalty phase of a capital trial if it is not relevant to an issue in the case. (*Dawson v. Delaware*

47

(1992) 503 U.S. 159, 167; *People v. Merriman* (2014) 60 Cal.4th 1, 104 (*Merriman*).)  When evidence suggesting racist beliefs by a defendant is probative of an issue raised by the proceedings, however, we have affirmed its admission, notwithstanding any risk of prejudice.  (See, e.g., *People v. Townsel* (2016) 63 Cal.4th 25, 66-67 [evidence of a racial slur used in the course of making a threat held admissible when the threat was relevant to the killing]; *Merriman*, at pp. 104-105 [evidence of defendant's racist beliefs admissible to explain defendant's past attacks and fights]; *People v. Richardson* (2008) 43 Cal.4th 959, 1030 [evidence of defendant's leadership of white prison gang admissible to explain his ability to control others].)

We agree with the trial court that evidence of defendant's tattoos and racial gang membership was relevant to explain the motivation for and savagery of his attack on Epperson.  Wounded racial pride could have caused him not only to assault Epperson, but to do so in a manner intended to cause her both great suffering and disfigurement.

Nor do we find error in the trial court's decision not to exclude the evidence under Evidence Code section 352, which permits the court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. " 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 144; see *People v. Booker* (2011) 51 Cal.4th 141, 188 [" 'Prejudice' in the context of Evidence Code section 352 is not synonymous with 'damaging': it refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome"].)  Further, as we have noted in connection with the admission of crime scene photographs during the penalty phase, " 'the trial court's

discretion [at the penalty phase] to exclude circumstances-of-the-crime evidence as unduly prejudicial is more circumscribed than at the guilt phase. During the guilt phase, there is a legitimate concern that crime scene photographs . . . can produce a visceral response that unfairly tempts jurors to find the defendant guilty of the charged crimes. *Such concerns are greatly diminished at the penalty phase* because the defendant has been found guilty of the charged crimes, and the jury's discretion is focused on the circumstances of those crimes solely to determine the defendant's sentence. Indeed, the sentencer is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light.' " (*People v. Moon* (2005) 37 Cal.4th 1, 35.) We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion. (*Eubanks*, at pp. 144-145.)

A crime involving the degree of violence demonstrated here is in some manner incomprehensible and inexplicable. In attempting to affix the appropriate penalty, the jury was entitled to hear evidence bearing on the factors that possibly brought on the violence, whether, in the defense's view, defendant's mental instability, or otherwise. One of those possible factors was Epperson's past intimate relationship, and her continued personal relationship, with an African-American man. Although we recognize the potential adverse consequences resulting from the introduction of evidence suggesting defendant held racist beliefs, those consequences do not constitute *undue* prejudice because his alleged beliefs might have contributed to the commission of the crime. In these circumstances, we find no abuse of discretion in the trial court's conclusion that the risk of undue prejudice was outweighed by the probative value of the evidence.

## 2. *Imposition of the death penalty on a mentally ill defendant does not violate the Eighth Amendment*

Defendant contends that even if he was not found to be legally insane at the time of the killing, the evidence demonstrates that he was and is mentally ill. He contends that imposition of the death penalty on a mentally ill person violates the Eighth Amendment's prohibition against cruel and unusual punishment.

We considered the identical argument in *Hajek and Vo*, *supra*, 58 Cal.4th 1144, concluding that neither the Eighth Amendment nor United States Supreme Court authority precludes imposition of the death penalty on mentally ill persons. (*Id.*, at p. 1251.) As we held, "[m]ost significantly, the circumstance that an individual committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing. There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence. We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*Id.*, at p. 1252.)

Soon after the issuance of *Hajek and Vo*, our decision in *People v. Mendoza* (2016) 62 Cal.4th 856 (*Mendoza*), re-affirmed its holding. We noted that *Hajek and Vo*'s "broad holding applies in the present case as well — especially considering that in this case the jury, after a separate trial involving copious testimony from mental

50

health experts, rejected defendant's claim that he was not culpable for the murders on the ground of insanity as defined by our law, and at the penalty phase rejected his argument that because of his mental illness the death penalty was not warranted." (*Mendoza*, at p. 910.) Just as in *Mendoza*, a jury found defendant legally sane after a trial and rejected his argument in the penalty phase that, because of his mental illness, he should not be put to death.

Defendant has presented no argument that was not considered and rejected in *Hajek and Vo* and *Mendoza*, and his claimed mental illness is not of a type that is materially different, for purposes of the *Hajek and Vo* analysis, from the impairments suffered by the defendants in those cases. We therefore decline to hold that the Eighth Amendment precludes defendant's execution by reason of mental illness.

### 3. Defendant's various constitutional challenges to California's imposition of the death penalty fail

Defendant raises a series of challenges to California's death penalty statute. As he acknowledges, these arguments have been rejected by this court in past decisions. As he anticipates, we decline to revisit our prior holdings with respect to these issues, which are listed below. Given the longstanding nature of our rulings, we do not reiterate their rationale.

California's death penalty laws adequately narrow the class of murderers subject to the death penalty. (*People v. Henriquez* (2017) 4 Cal.5th 1, 45 (*Henriquez*).) In particular, the special circumstances of section 190.2, which render a murderer eligible for the death penalty, are not so numerous and broadly interpreted that they fail adequately to narrow the class of persons eligible for death. (*People v. Johnson* (2016) 62 Cal.4th 600, 654-655; *People v. Myles* (2012) 53 Cal.4th 1181, 1224-1225.)

51

Section 190.3, factor (a), which permits the jury to consider the circumstances of the capital crime in its penalty determination, does not license the jury to impose death in an arbitrary and capricious manner in violation of the United States Constitution.  (*Henriquez*, *supra*, at p. 45; *People v. Brown* (2004) 33 Cal.4th 382, 401.)

The federal Constitution does not require that the jury agree unanimously on which aggravating factors apply.  (*People v. Jackson* (2016) 1 Cal.5th 269, 372 (*Jackson*); *People v. Lewis* (2008) 43 Cal.4th 415, 533.)  Nor is the death penalty unconstitutional for failing to require proof beyond a reasonable doubt that an aggravating circumstance has been proved (other than section 190.3, factor (b) or (c) evidence), that the aggravating factors outweigh the mitigating factors, or that death is the appropriate sentence.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)  For that reason, again other than section 190.3, factors (b) and (c), the jury need not be instructed that proof beyond a reasonable doubt is required.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429.)  These conclusions are not affected by *Apprendi v. New Jersey* (2000) 530 U.S. 466 or *Ring v. Arizona* (2002) 536 U.S. 584.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 732.)

The jury need not make written findings regarding the existence of aggravating factors.  (*Mendoza*, *supra*, 62 Cal.4th at p. 916; *People v. Clark* (2011) 52 Cal.4th 856, 1007.)

There is no Eighth Amendment requirement that our death penalty procedures provide for intercase proportionality review.  (*People v. Johnson*, *supra*, 62 Cal.4th at p. 656; *People v. Lang* (1989) 49 Cal.3d 991, 1043.)

The jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without any requirement that the jury unanimously find that the activity was proved beyond a reasonable doubt, does not deprive a defendant of any federal constitutional right, including the Sixth

Amendment right to trial by jury and the Fourteenth Amendment right to due process. (*People v. Clark*, *supra*, 52 Cal.4th at p. 1007; *People v. Balderas* (1985) 41 Cal.3d 144, 204-205.)

Nor does section 190.3's use of adjectives such as "extreme" and "substantial" in factors (d) and (g), respectively, act as a barrier to the jury's consideration of mitigating evidence, in violation of constitutional commands. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 656; *People v. Adcox* (1988) 47 Cal.3d 207, 270.) The court was not required to instruct the jury that the statutory mitigating factors were relevant solely to mitigation, and the court's instruction directing the jury to consider "whether or not" certain mitigating factors were present did not invite the jury to use the absence of such factors as an aggravating circumstance, in violation of state law and the Eighth and Fourteenth Amendments. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 656; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123.)

The failure to afford capital defendants at the penalty phase the same procedural safeguards afforded to noncapital defendants does not offend equal protection principles, because the two groups are not similarly situated. (*Brooks*, *supra*, 3 Cal.5th at p. 116; *People v. Whalen* (2013) 56 Cal.4th 1, 91.)

California does not regularly use the death penalty as a form of punishment, and "its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment." (*People v. Clark*, *supra*, 52 Cal.4th at p. 1008.)

### D. Alleged Cumulative Effect of Asserted Errors

Defendant argues that the cumulative impact of the asserted errors at the guilt and penalty phases rendered his trial fundamentally unfair and deprived him of other constitutional rights. Because we have concluded there was no

error related to the trial on the capital offenses or their punishment, there is nothing to cumulate and, in any event, we reject the claim that any asserted cumulative effect warrants reversal.

### III. DISPOSITION

The judgment is affirmed in its entirety.


                                                    **CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**JOHNSON, J.***

---

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Powell

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S137730
**Date Filed:** August 13, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William Pounders

_____

**Counsel:**

R. Clayton Seaman, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

R. Clayton Seaman, Jr.
P.O. Box 12008
Prescott, AZ  86304
(928) 776-9168

Pamela C. Hamanaka
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6208