Filed 5/28/25  P. v. Dorey CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LEIGHTON BROMILUY DOREY, IV,<br><br>    Defendant and Appellant. | D082268<br><br><br>(Super. Ct. No. SCN373721) |


APPEAL from a judgment of the Superior Court of San Diego County, K. Michael Kirkman (Ret.), Carlos O. Armour, Judges.  Affirmed with modification.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Leighton Bromiluy Dorey IV (Dorey) killed his elderly father, Leighton Dorey III (Leighton III), when he was alone at home. A jury convicted him of first degree murder with the torture special circumstance. Dorey raises four issues on appeal. He contends the evidence he intended to cause his father extreme and prolonged pain was insufficient to support the jury's verdict and special circumstance finding. He contends the trial court failed to provide him with an adequate opportunity to "fully air his grievances" at a *Marsden*[1] hearing. He asks us to conduct an independent review of crime laboratory records for *Brady*[2] material or other discoverable evidence. Finally, he contends the minute order and abstract of judgment incorrectly reflect the imposition of a $10,000 parole revocation fine. Apart from directing a minor change to the abstract of judgment, we affirm the judgment in all respects.

PROCEDURAL BACKGROUND

In June 2017, the San Diego County District Attorney charged Dorey with the first degree murder of Leighton III. (Pen. Code,[3] § 187, subd. (a).) The operative information alleged the special circumstance that the murder was intentional and involved the infliction of torture. (§ 190.2, subd. (a)(18).) Dorey pled not guilty.

Wilfrid Rumble was assigned to represent Dorey by the San Diego Office of the Public Defender. The District Attorney initially sought the

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2] *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

[3] Undesignated statutory references are to the Penal Code.

death penalty, but Rumble persuaded her to seek a maximum sentence of life without the possibility of parole (LWOP).

In March 2019, Dorey changed his plea to not guilty and not guilty by reason of insanity (NGI).  He withdrew the NGI plea two months later.

The case was tried to a jury starting in August 2019.  The first jury to hear the case was unable to render a unanimous verdict.

In December 2019, Dorey asked the trial court to relieve Rumble and appoint substitute counsel to represent him at his second trial.  After conducting a *Marsden* hearing, the court denied his motion.  In February 2020, the court granted Dorey's motion to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806.  He represented himself at his second trial.

In June 2022, the second jury found appellant guilty of first degree murder and found true the torture special circumstance allegation.  In May 2023, the court denied probation and sentenced appellant to LWOP.

FACTUAL BACKGROUND

I.

*Strained Family Dynamics*

In 2017, Leighton III and his wife, Kimberly D., lived in Rancho Santa Fe.  They were in their seventies and retired.  Kimberly was Dorey's stepmother and had known him since he was 18 years old.  She believed she and Leighton III had a good relationship with Dorey until 2012.

In 2012, Dorey was 35 or 36 years old.  He was using drugs and struggling to find jobs and a place to live.  According to Kimberly, Leighton III tried to be supportive, but their relationship now had "good times" and "bad times."

3

In 2013, Dorey moved to France and his relationship with Kimberly and Leighton III became one of "e-mails and phone calls." It also became more and more strained. The phone calls started out nice but would turn caustic. Dorey complained about Kimberly, his father, the government, and his employers. The constant complaining would eventually cause Leighton III to hang up. Dorey also regularly complained—on the phone and in more than 100 email messages—that he needed money, which Leighton III declined to provide.

Kimberly eventually became frightened by the thought that Dorey might return from France and come to their house. In emails, Dorey began referring to Kimberly as "Lady Warbucks," a reference to her work in the military defense industry before she retired. He falsely accused Leighton III and Kimberly of trying to poison him before he left for France. In a 2016 email, he asked Leighton III, "Why don't you go murder your wife and take all her money[?] Fuck you."

Later that year, in December 2016, Dorey wrote messages to his biological mother and a friend insinuating he had been physically abused by Leighton III as a child and suggesting he was entitled to reciprocate. To his mother, he wrote, "Mom, if I were to give dad one good knock on the head that's about equal in force to the combined effect of all the spankings he gave me, do you think I have a right to do so as the inherit[or] of the fascist failure factory?"

In another email to his mother, he wrote, "If you think parents have the right to impose violence upon their children in order to teach morality, then when their children are grown up and they find their parents, or some of their parents, are feeble and old war criminals, don't the children then have the right and perhaps the duty in protection of the planet to reciprocate their

4

parents' violence and terminate the crime spree of their parents' fraud and fascism? If dad wants to teach me that getting away with war crimes is more important than promoting liberty and justice, don't you think he should be the first to suffer from his bad teachings?"

To his friend, he wrote, "I think parenting is only morally dubious if the parent presumes the right [to] impose violence upon their children with disregard to their children's well-being. In this case, perhaps the children should be responsible for their parents' death."

In January or February 2017, Dorey called Leighton III and said he would be returning to San Diego. He asked him if he would pick him up from the airport and rent him a car. Leighton III said he would pick him up, but would not agree to rent him a car.

A few months later, in April 2017, Dorey sent an email to Leighton III asking, "Would you like me to operate under the principal that if I hurt you I will only be helping you?" He also wrote, "There's no such thing as a real victim in any crime, no matter how heinous the crime because the victim was there causing the crime. Would you like me to operate under the principle that if you are victimized by a violent crime of fascist aggression that the crime is actually your fault?" That same month, Leighton III upgraded the security system at the house because he was concerned about some of the "frightening things" Dorey had said in email messages.

## II.

### *The Homicide*

On May 26, 2017, Dorey surprised Leighton III and Kimberly at their home around lunchtime. He had flown back from France a few days earlier, and he was driving a black Jeep that his mother had given him. Leighton III

was thrilled to see his son. They spent time outside in the yard catching up. Kimberly joined them after 20 minutes.

Dorey said he was in town for only a couple of days and would be headed to Los Angeles to meet with some other people. Leighton III wanted to see more of Dorey and said, "Well, we need to get together for lunch or dinner."

Dorey did not commit to a lunch or dinner meeting. He said he was unable to afford a hotel and would be sleeping in the Jeep. Abruptly, he ended the conversation and said, "he better go." As Dorey left, Leighton III yelled, "I love you," but Dorey did not respond.

Four days later, on May 30, 2017, Kimberly took her dog to a veterinarian appointment. She called Leighton III at 10:54 a.m. to let him know she was on her way home. Leighton III told her Dorey was there.

Kimberly arrived home and saw Dorey's car parked near the third garage door at an angle. She drove her car into the garage and brought her purse and the veterinarian paperwork inside. She spent some time getting the elderly dog out of the car and into the house. When she finally went to find Dorey and Leighton III, Dorey's car was no longer in the driveway. She thought they had gone to lunch and she just missed them.

At 11:15 a.m., Kimberly called Leighton III's phone to let him know she would try to meet them for lunch, but he did not answer. She thought this was strange. She called him several times more while she went to look for him around the house.

Kimberly found Leighton III's "mutilated body" in a loft area where she had her home office. "His body was stretched across an area near the entrance to the loft." She was horrified. "His nose had been blown off. [She] could see . . . the bones. [She] saw teeth missing. . . . [She] couldn't see his

6

eyes there was so much blood on his face. And there was a big cut on his chin, and his shirt was up a little bit." She could see he was not breathing. She dragged their dog to the kitchen and called the paramedics. While calling, she thought to herself, "My God, . . . [Dorey] was here and his car was here."

### III.

#### *The Crime Scene and Autopsy*

Paramedics arrived at 11:35 a.m. Leighton III had no pulse and was pronounced dead. Sheriff's deputies cleared the house. A crime scene technician and two criminalists documented, collected, and preserved evidence. One day later, a pathologist performed an autopsy.

At the time of his death, Leighton III was 71 years old, 69 inches tall, and weighed 158 pounds.[4] His body was found face up on the floor of the lower loft area with his legs lying in the door space to an adjacent bathroom. His right shoe was on, but his left shoe was off. A belt with the buckle missing was lying next to his left leg. The buckle was by his foot, just inside the bathroom.

There were bloodstains all over the room. There were teeth and teeth fragments scattered on the floor. In the bathroom, consistent with an attacker cleaning up after an attack, there were bloodstains diluted with water on the shower handle, showerhead handle, shower floor, countertop, and faucet handle.

Leighton III's whole face was covered with blood and there was a large pool of blood under his head. According to a forensic pathologist who

---

[4] Dorey was 39 years old, 6 feet tall, and weighed slightly less than 180 pounds.

witnessed the autopsy, "blunt force injuries" to Leighton III's head were caused by at least 10 or 11 impacts that all occurred before he died.

On the right side of his frontal forehead, a two-and-one-fourth inch laceration was deep enough to reach the bone. There was another laceration on the left side of his forehead as well as an area of contusion and abrasion. The cartilage of his nose was fractured and separated from the bone of his nose. The bone that "forms the cheekbones and the top of the mouth" (the maxilla) was also fractured and nine teeth were missing from the upper jawbone.[5] Seven of the nine missing teeth (or fragments of them) were found in locations throughout the loft. Of the seven teeth that remained in the jawbone, all but one were loose or broken.

There were scrapes and bruises on both of Leighton III's cheeks and under his chin. His tongue and ear were bruised. There were bruises on the front of his nose and around his nose and left eye. Both sides of his face, both ears, and his upper lip were scraped and bruised as well. His lower lip was torn all the way through to the inside of his mouth. A one and a half-inch laceration on the bottom of his chin went all the way to the jawbone.

According to the pathologist, numerous internal injuries to Leighton III's brain were also caused by blunt force impacts that occurred before he died. The autopsy revealed subarachnoid bleeding and bruising in multiple areas. There was a subdural hemorrhage on the right side of his brain toward the back. There were small hemorrhages in the white matter in the center of his brain. There was a hemorrhage in his brain stem. Swelling on the bottom part of Leighton III's brain had caused "uncal notching," which

---

[5] According to his dentist, Leighton III had good dental health and did not have any loose teeth as of his last check-up in December 2016.

8

means that "part of the brain went through a hole in the bone," creating a "notch." These injuries were sufficient to kill Leighton III by rendering him unconscious and unable to protect his airway and breathe.

In addition to the injuries caused by blunt force impact, the pathologist believed that injuries to Leighton III's neck and eyes were caused by strangulation sufficient in force and duration to asphyxiate him. These injuries also all occurred before he died. A long linear mark was visible on the outside of his neck. His eyelids and the surface of his eyes both contained petechial hemorrhages, which are caused by strangulation. His hyoid bone and his Adam's apple (laryngeal cartilage) were fractured.

Leighton III also had six broken ribs. His cervical spine was fractured and bleeding in two places. His thoracic spine was fractured and bleeding at the fifth and eleventh vertebrae. He sustained five blunt force injuries to his back, deep under his skin. The large muscle in his neck, between the ear and collarbone (clavicle), was torn and bleeding. These blunt force injuries to his torso were not independently fatal. But, according to the pathologist, they also all occurred before Leighton III died. The fractures would have been painful.

The medical examiner who conducted the autopsy agreed with the pathologist that it was not possible for Leighton III to have died before the blunt force impact injuries were inflicted; the injuries occurred when he was alive. All the injuries had a significant amount of bleeding (hemorrhaging) associated with them. Bleeding happens only when a person is alive and has a heartbeat that pushes blood through the arteries and veins. For this reason, postmortem injuries do not resemble antemortem injuries; they are pale and colorless. Leighton III did not have any "clear-cut, obvious postmortem injuries," including the injuries to his brain.

9

Consistent with the pathologist and medical examiner, an expert in crime scene reconstruction and blood stain pattern analysis opined that the blood spatter and other crime scene evidence showed Leighton III's injuries occurred before he died. In his opinion, all of the bloodstains in the room, with one exception, were created by wounds that occurred while Leighton III was alive and his heart was still beating. Only the large pool of blood on the floor near Leighton III"s head could have collected there after his death.

In the expert's opinion, based on the blood spatter evidence, the injuries took place in several different locations in the loft area. In the hallway leading to the loft area, where one of Leighton III's hearing aids was found, there were bloodstains on the carpet and on the baseboard. In the loft itself, there were large bloodstains on the floor, the surrounding walls, the bathroom door jamb, a table, and a bookshelf. The stains appeared to have been made during separate confrontations around the room. In addition, a separate "bleeding wound," most likely to the head, was created by the stairs. There were bloodstains on the first three stair steps to the loft, on the vertical portion of the fourth step, and on the handrail. There were also stains on the wall next to the stairs, the highest of which was about three feet from the floor.[6]

Leighton III, in addition, had defensive injuries that were consistent with holding his hands in front of his face, while still alive, to try to protect it. The back of his right hand was bruised and there were "small[ ] scrapes and bruises on the backs of the fingers." His right forearm and the back of his left hand were bruised and scraped. The skin on his left forearm was torn.

---

[6] According to the expert, the stains were inconsistent with the body being dropped down the stairs headfirst.

Notably, the bloodstain evidence was inconsistent with Leighton III ever standing up and walking around after he started bleeding. The small bloodstain on the bottom of one of his shoes was inconsistent with walking through the large amount of blood on the floor. The tops of his shoes and their outer soles did not have enough blood on them to be consistent with blood falling downward from his wounds while he was standing. The bloodstains on the wall in the loft area were also inconsistent with him standing while he was bleeding. They were no higher than two-and-a-half feet, and they had all hit the wall either in a downward direction or a 90-degree angle. Instead, in the crime scene expert's view, the blood on the wall and on the front of Leighton III's body, on places like his thigh, was consistent with him being on his knees while he was attacked and trying to flee.

By contrast, at some point, the attacker was standing and not wearing shoes while walking around the room. There were naked "bloody foot impressions" on the stone floor near Leighton III's body and at other locations in the loft area. The impressions were caused by "a foot that [did] not have a sock or shoe on it that . . . stepped into a blood source and subsequently stepped in another area."

The crime scene expert could not say, based on the crime scene evidence alone, whether the attacker had ever been wearing shoes during the attack. He could say, however, that if the attacker was wearing shoes at the beginning of the attack, the earlier they were removed, the less blood he would expect to find on them.

Finally, according to the crime scene expert, it was obvious Leighton III's body had been moved to the location where it was ultimately found. Consistent with being wounded elsewhere in the loft and then dragged on the

11

floor, he was found with his shirt and sweater pulled up and his pants slightly pulled down, and with one of his hearing aids, his phone, and one of the bloody footprints underneath his body.

The medical examiner who performed the autopsy concluded the cause of death was "strangulation and blunt force injuries of the head, neck, and torso." It was the combination of injuries that resulted in death. Nothing about the injuries indicated whether the strangulation or blunt force head trauma occurred first.

## IV.

### *Dorey's Arrest and Injuries*

Members of a fugitive task force team tracked Dorey's phone to the Palm Springs/Idyllwild area. They located his car in Idyllwild at 8:00 p.m. on the same day Leighton III was killed. They arrested Dorey the next morning at 7:15 a.m. when he returned to his car.

Dorey's right hand was swollen and bandaged. He had been treated the day before at a hospital for a fractured "finger metacarpal," which is a small bone located between the knuckle and wrist. This kind of fracture is commonly known as a "boxer's fracture," because it is usually "sustained by somebody hitting a solid object."

Dorey had scratches and small injuries to his arms, legs, ankles, right thumb, and the right side of his hip, and scratches to his lower back. He had an injury to the right side of his neck, but no redness or other markings. There were no injuries to the back or top of his head.

Leighton III's DNA was found on fingernail swabs of Dorey's right hand and the interior pocket of a pair of shorts found in a suitcase in Dorey's car; in bloodstains found on the driver's seat, the steering wheel, and the steering wheel adjustment lever; as well as in a single bloodstain each on the heel of

12

the left shoe and the tongue of the right shoe Dorey was wearing when he was arrested.

## V.

### *Dorey's Trial Testimony*

Dorey testified at trial that he had a difficult relationship with Leighton III when he was growing up. According to Dorey, he "could be nurturing, he could be supportive, but he could also be tremendously violent, with unexpected explosive bursts of anger, and brutal." While Dorey was growing up, he hit him with a wooden spoon, an "industrial-sized cooking ladle," a belt, his hands, and "branches from the yard." He beat him severely on several occasions. He liked to give him "humiliation spankings" in front of dinner guests. He also forced Dorey to work on renovations to the old "country estate" where they lived. In Dorey's view, the work he was required to perform was inappropriate "child labor."

Leighton III changed in 1991 or 1992 after he was diagnosed with colon cancer and survived. He studied holistic medicine and became "more accepting, more peaceful, more tolerant." Dorey's relationship with him improved and he chose to live with him when his parents divorced. They had "three close years" during Dorey's last three years of high school. But the relationship grew distant after Leighton III married Kimberly, and more distant when Dorey began to use drugs and to grow marijuana, and further distant when he later moved to France.

In 2013, Dorey believed Leighton III and Kimberly tried to poison him by slipping something into his water bottle one night when he was visiting. After the incident, Leighton III "completely cut [Dorey] off," "no birthday gifts, no Christmas presents, no financial support of any kind."

13

Nevertheless, in 2015, Dorey contacted Leighton III after he lost his job and the United States Internal Revenue Service and California Franchise Tax Board began collecting back taxes that he owed. When they reconnected, Leighton III dismissed Dorey's questions about the "poisoning incident," saying, "I don't want to hear your paranoia." He also declined Dorey's requests for financial support and said he would not inherit anything from him.

In 2017, Dorey decided to return to the United States. He was unemployed, "behind on bills," and his auto insurance had expired. His car was not starting well, and his mother offered him $15,000 toward a new car if he returned.

Dorey flew to San Diego on May 19, 2017. He visited some friends from high school and picked up the Jeep his mother had purchased for him. After meeting with a prospective investor for a business idea, he decided he "wanted to reconnect" with his father. Leighton III had been a "really nice, decent guy" during Dorey's high school years. Dorey wanted "to get over this fear that he had tried to poison [him]." He wanted to believe the evidence that he was poisoned was "just a coincidence." So he dropped by on May 26 and visited with Leighton III and Kimbery for 30 to 45 minutes.

According to Dorey, on the morning of May 30, he received an email message from Leighton III suggesting they get together again. Dorey decided to drop by unannounced because he was still concerned about the poisoning incident. He arrived sometime between 10:40 and 10:50 a.m. Kimberly called and spoke with Leighton III shortly after he arrived.

Dorey tried to talk about the poisoning incident with his father, but Leighton III did not want to discuss it. Leighton III suggested they look at some changes to the house instead. As they walked toward the loft area,

14

Leighton III pointed to a portrait on the wall. Using a family nickname for Dorey, he said, "That's the L.B. that I prefer to remember."

Dorey noticed his left shoe was untied and he kneeled down to tie it. As he did so, he heard "rustling" behind him. The next thing he knew, Leighton III "whipped his belt over [his] head," and screamed, "Now you're dead," in an "authoritarian, angry, vindictive, . . . aggressive, . . . murderous tone of voice," and started choking Dorey with the belt.

Dorey grabbed at the belt, "pushed him back a little bit," "swung a right back fist," and "caught him on the right side of his head." Leighton III "stumbled backwards" into the hallway area. Dorey tried to run past him, but Leighton III tripped him, pushed him down to the floor, and began "pounding [him] with hammer fists on the back of the head." Dorey was "seeing stars" and thought he was going to die.

Dorey hit Leighton III with a "right cross" that broke Dorey's hand. Leighton III fell down and Dorey decided to put him in a "sleeper hold" to subdue him. But Leighton III "instantaneously" went limp." When Dorey released him from the sleeper hold, he was not breathing and had no pulse.

According to Dorey, he then made a "really stupid decision." He decided to make it look like Leighton III hung himself "from one of the railings on the steps or one of the rails from the railing." He dragged Leighton III's body back to the steps in the loft area and did a "weight test" with his belt to see if he could "hoist him up to [the] railing." Dorey was able to use the belt to pull Leighton III's torso off the ground, but the belt broke and Leighton III's head went "slamming down into the ground."

Dorey knew Kimberly was on her way home and he had to rush. He thought, "well, he's here at the bottom of the steps. Maybe I can make it look like he fell down the stairs." He pulled Leighton III's torso up by the back of

his shirt collar and dropped his head onto to the bottom step, but he "did not hear his neck snap." Without a broken neck, Dorey did not think it would be a "convincing fall down the stairs." So Dorey continued to try and snap Leighton III's neck by dropping it on the stairs several times. He "saw a tooth go flying," but never heard Leighton III's neck snap.

Next, according to Dorey, he decided to try to make it look like Leighton III fell down the stairs "by literally throwing him down the steps." He "turned him over" and "dragged him up the steps from under his arms to the midway landing area, and . . . tried to lift him up as high as [he] could at that point and then push him forward." But Leighton III's body "just fell downwards for the most part. His knees slumped and he fell forwards and basically slid down the steps."

Dorey started crying because he realized he "was making a terrible bloody mess." He took his shoes, socks, and pants off. While barefoot, he "repositioned" Leighton III to make his position "seem more natural." He was just about to take a shower when he heard Kimberly's car in the driveway. He left because he was afraid she might have a gun.

In Dorey's view, he acted in self-defense and was guilty only of the "vandalism" of his father's body after he died.

DISCUSSION

I.

*Sufficient Evidence Supports Dorey's Conviction for First Degree Murder with the Torture Special Circumstance*

Dorey contends his conviction must be reversed because the evidence was insufficient to support the torture-murder theory of first degree murder and the torture murder special circumstance. He contends the intent element of murder by torture may not be inferred solely from the condition of

16

the victim's body, and the only evidence in the record that Dorey had torturous intent was the condition of Leighton III's corpse. We disagree. The condition of Leighton III's body was not the only evidence Dorey intended to inflict extreme and prolonged pain. The existence of this additional evidence distinguishes the instant case from Dorey's cited case authorities. (See, e.g., *People v. Anderson* (1965) 63 Cal.2d 351; *People v. Tubby* (1949) 34 Cal.2d 72; *People v. Bender* (1945) 27 Cal.2d 164, disapproved on different grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110; *People v. Walkey* (1986) 177 Cal.App.3d 268.) As we explain, the totality of the evidence of first degree murder and the torture special circumstance was solid and compelling.

A. *Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. In so doing, a reviewing court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings." (*People v. Powell* (2018) 5 Cal.5th 921, 944 (*Powell*) [cleaned up].)

Significant here, Dorey did not move for acquittal on the first degree murder charge or the torture special circumstance allegation at the close of the prosecution's case in chief. (§ 1118.1.) Our review of the evidence therefore includes all evidence in the trial record, including not only the prosecution's case in chief, but also the defense case and the prosecution's rebuttal case.

17

Also significant, the jury was instructed on two theories of first degree murder: (1) premeditated, deliberate murder, and (2) murder by means of torture. The general rule, under this circumstance, is we must affirm the first degree murder conviction if there is substantial evidence to support either theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).)

Dorey contends an exception to the general rule applies. He contends reversal is required if he demonstrates insufficient evidence to support the torture-murder theory only, i.e., he does not need to address the sufficiency of the evidence of premeditated and deliberate murder. He is incorrect.

It is true, in cases where more than one theory for conviction is presented to the jury, "the record may sometimes affirmatively indicate that the general rule should not be followed" and reversal will be required despite a valid basis in the record to support at least one factually adequate theory for conviction. (*Guiton, supra,* 4 Cal.4th at p. 1129.) "We may, for example, hypothesize a case in which the district attorney stressed only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground." (*Ibid.*) In such cases, a review of the entire record might affirmatively demonstrate a reasonable probability that the jury found the defendant guilty solely on an unsupported theory. (*Id.* at pp. 1129–1130, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) In such situations, however, "instruction on an unsupported theory is prejudicial *only* if that theory became the *sole* basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict." (*Id.* at p. 1130, italics added.)

Here, the record does not affirmatively demonstrate a reasonable probability that jurors convicted Dorey based solely on the torture-murder

18

theory.  The prosecutor addressed both theories in detail during closing argument.  The jury did not ask questions related to the torture-murder theory.  And, contrary to Dorey's contention, the jury's true finding on the torture special circumstance is no indication it relied *solely* on the torture-murder theory to convict Dorey of first degree murder.  The elements are not coextensive.  The torture special circumstance under section 190.2, subdivision (a)(18), differs from torture murder under section 189.  The torture special circumstance does not require premeditated and deliberated torturous intent.  (*People v. Steger* (1976) 16 Cal.3d 539, 546.)  Nor does it require an intent to inflict prolonged pain.  (*People v. Davenport* (1985) 41 Cal.3d 247, 261, 269.)  We must therefore affirm the jury's verdict if our review of the record demonstrates substantial evidence to support either theory.  (*Guiton, supra,* 4 Cal.4th at p. 1130.)

As we explain, both theories—torture murder and premeditated and deliberate murder— were supported by substantial evidence.

B.    *Substantial Evidence of Torture Murder and Torture Special Circumstance*

"All murder which is perpetrated by means of . . . torture . . . is murder of the first degree."  (§ 189.)  " 'Murder by torture requires (1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent.' "  (*Powell, supra,* 5 Cal.5th at p. 944.)  "The elements of a torture-murder special circumstance (§ 190.2, subd. (a)(18)) are similar but not identical."  (*Ibid*.)  To prove the special circumstance of torture, "the prosecution must show th[e]

19

defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Streeter* (2012) 54 Cal.4th 205, 237; § 206.)

Here, Dorey does not dispute the evidence was sufficient under the substantial evidence standard to demonstrate he intended to kill Leighton III nor that his acts created a high probability that he would die. He claims the evidence was insufficient to demonstrate he intended to cause extreme and prolonged pain. Specifically, he claims the condition of Leighton III's body was the only evidence in the record that he harbored torturous intent, and that the severity of his injuries alone was an insufficient basis to infer the required "intent to inflict cruel suffering."

It is true our Supreme Court has "cautioned against giving undue weight to the severity of [a] victim's wounds," when assessing the sufficiency of evidence to support torturous intent. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1239.) "[H]orrible wounds may be as consistent with a killing in the heat of passion, in an 'explosion of violence,' as with the intent to inflict cruel suffering." (*Ibid.*) But here, the condition of Leighton III's body after the attack was far from the only evidence that Dorey intended to cause extreme pain or suffering.

"An intent to cause extreme pain or suffering may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body." (*People v. Brooks* (2017) 3 Cal.5th 1, 65–66 [cleaned up].) Here, the circumstances preceding the killing provided overwhelming support for a reasonable jury to conclude Dorey intended to cause extreme pain and suffering for the purpose of revenge. Dorey had been angry at his father for many years about his alleged child abuse and unwillingness to provide

20

financial support.  A month and a half before the killing, he sent an email message asking him, "Would you like me to operate under the principal that if I hurt you I will only be helping you?"

A few months before that, in email messages to his mother, he openly mused about hurting Leighton III and making him suffer in retaliation for the alleged child abuse.  He *specifically considered* knocking Leighton III on the head with extreme force "equal in force to the combined effect of all the spankings" that he had allegedly received from him when he was a child.  Notably, this was consistent with the 10 to 11 blunt force injuries Leighton III eventually received to his head before he died.

The nature of the killing, too, provided ample support for concluding Dorey harbored premeditated, deliberated, and calculated torturous intent.  According to Kimberly, Leighton III would remove one of his hearing aids when he spoke on the phone, and one of them was found on the floor in the hallway leading to the loft area.  From this, reasonable jurors could infer Dorey first attacked Leighton III in the hallway right after he finished speaking with Kimberly.  Then, knowing Kimberly would not be home for 15 to 20 minutes, he seized the opportunity he had been thinking about for months—as evidenced by his email messages about hurting his father and making him suffer—and deliberately commenced an excruciatingly painful beating, one timed to last until Kimberly's estimated return.

From the crime scene evidence, jurors could readily infer the beating Dorey administered was cruel and cold-blooded, not a killing in the heat of passion.  According to the crime scene expert, jurors could infer from the lack of blood on Dorey's shoes that he purposely paused to remove them early on during the attack to keep them from getting bloody.  They could infer the attack occurred in several locations throughout the room and included a

21

period of time when Leighton III was on his knees with his teeth falling out trying to crawl away.

*In addition*, the condition of Leighton III's body overwhelmingly supported the inference that the pain Dorey intended to inflict was extreme. Leighton III suffered blunt force injuries all over his upper body that were inflicted with enough force to cause extensive bleeding and break more than a dozen bones. Jurors could infer Dorey deliberately bashed Leighton III's face on the stairs or punched it with enough force to knock out, loosen, or break all of his teeth except one. Leighton III's body was covered with gratuitous, nonfatal wounds, including wounds to the particularly sensitive area of the face. Those wounds went through to the bone in some cases and left his face covered in blood. (See *Powell, supra,* 5 Cal.5th at p. 948 [holding that the "defendant's infliction of gratuitous injuries in addition to [a] fatal beating provided substantial evidence of an intent to inflict pain and suffering for [its] own sake"].) The injuries all occurred while Leighton III was still alive. Expert testimony was not needed for jurors to be certain beyond a reasonable doubt that Dorey knew the injuries would have been unfathomably painful.[7]

Finally, although not a focus in his opening brief, Dorey argues at length in his reply brief that "a [20] minute attack . . . is not prolonged." We are not persuaded. As discussed extensively, Leighton III's injuries show an extended beating above and beyond what was needed to cause death. Leighton III was alternately strangled and punched, and also perhaps kicked, all over his head, neck and upper body. The beating took place in several

---

[7]     The "defendant's intent to inflict pain and suffering . . . is at the heart of torture murder. It need not be demonstrated that the victim was actually conscious and suffered pain at the time otherwise painful injuries were inflicted." (*Powell, supra,* 5 Cal.5th at p. 945 [cleaned up], italics omitted.)

locations about the loft area with the evidence suggesting Dorey pursued Leighton III while he was injured. Large numbers of Leighton III's injuries were nonfatal and inflicted in the particularly sensitive area of the face. It was for the jury to decide whether the beating was "prolonged." We do not consider 15 to 20 minutes of the kind of agonizing pain inflicted here to be insufficient as a matter of law. We accordingly decline to second guess the reasonableness of a jury verdict on this point.

The torture-murder theory for first degree murder and the torture special circumstance finding were supported by substantial evidence.

C.      *Substantial Evidence of Premeditated and Deliberate Murder*

" 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*In re Lopez* (2023) 14 Cal.5th 562, 580 [cleaned up].)

Here, based on our review of the evidence, the premeditation and deliberation theory was also sufficiently supported by the evidence. Five months before the homicide, Dorey specifically considered whether killing his father would be justified in retaliation for his alleged child abuse. He wrote to a friend, "if [a] parent presumes the right [to] impose violence upon their children with disregard to their children's well-being," then "perhaps the children should be responsible for their parents' death." As noted, the evidence showed Dorey knew that Kimberly would not be home from the veterinarian's office for 15 to 20 minutes after her call, and this provided Dorey with the opportunity to retaliate against his father, which is something he had been contemplating for months. Jurors could infer from the lack of

23

blood on Dorey's shoes that he purposely paused to remove them early on during the attack to keep them from getting bloody. And no one would expect anyone to survive the injuries Dorey inflicted upon Leighton III.

Dorey also strangled Leighton III during the attack. Strangulation is uniquely probative of premeditation and deliberation. It "requires an offender to apply constant force to the neck of the victim [and] affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020 [ligature strangulation]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 11–12 [manual strangulation].) The premeditation and deliberation theory for first degree murder was thus supported by substantial evidence. Indeed, the evidence of a premediated and deliberate killing was overwhelming.

Dorey's conviction for first degree murder with the torture special circumstance is affirmed.

## II.

### *The Trial Court Conducted a Proper* Marsden *Hearing*

Dorey contends the trial court violated his right to due process and effective assistance of counsel. He claims the trial court did not allow him to "fully express his grievances" at a hearing to consider his request for his court-appointed trial counsel to be relieved pursuant to *Marsden, supra,* 2 Cal.3d 118. According to Dorey, the court "did not permit [him] to substantively and comprehensively articulate the causes of his dissatisfaction with counsel and how they affected his defense except in one instance." As a result, he claims, "[t]he court did not conduct an inquiry sufficient to ascertain whether trial counsel had rendered ineffective assistance." We are not persuaded. The record does not support Dorey's contentions. Our review is for abuse of discretion. (*People v. Ng* (2022) 13 Cal.5th 448, 500.)

24

A.    *Additional Background*

A few months after the first trial ended in mistrial, Dorey asked the trial court to relieve Rumble and appoint new counsel. He had a seven-page list of concerns and issues with Rumble's representation over the preceding two and a half years. The court cleared the courtroom and conducted a *Marsden* hearing with Dorey, Rumble, and court staff present. The court spent approximately an hour addressing Dorey's complaints.[8]

Dorey began with a series of concerns about the time it took to bring the case to trial before the first jury. He complained that Rumble had missed 19 appointments with him "in a period of less than a year from September 2018 to August 2019." He complained that Rumble had not been "proactive" about setting a meeting to discuss whether the prosecution would seek the death penalty and instead "wait[ed] for the District Attorney's Office to get in touch with him." He complained that Rumble repeatedly said the meeting would take place and the District Attorney's office would have a decision on whether it would continue to seek the death penalty by certain dates, but he had not been correct about the timing of the meeting or decision.

Dorey complained that Rumble also repeatedly said he would be ready for trial by certain dates, but then would not be ready, resulting in the start of trial delayed by almost a year. In particular, he claimed that trial was continued because Rumble failed to complete a set of "action requests" on time. The action requests were "items" Dorey believed "needed to be done to get us prepared for trial." They mostly involved potential questions for witness interviews and a review of Dorey's "e-mail history." According to

---

[8]    The judge who addressed Dorey's complaints was not the same judge who presided over the first trial.

Dorey, Rumble "said they would be done by . . . the January trial date. They weren't. Then he said they would be done by the March trial date in 2019, and they weren't. Then he said they would be done by the May trial date in 2019, and I came to find out in April of 2019 that he hadn't even started on the list yet."

The trial court addressed each issue raised by Dorey in turn, asking Rumble for a response when needed.

Rumble represented that he met with Dorey at least 50 times over the course of the representation and "spent an incredible amount of time with [him], preparing for the trial." He explained that the September 2018 trial date was "continued to afford [Rumble] the opportunity to meet with the District Attorney" to try and convince her to refrain from seeking the death penalty. In accordance with office "protocol," it took a "lot of work" and he spent "a great deal of time" preparing for the meeting. There were also "logistical problems in setting up meetings with the District Attorney's Office in terms of her availability and . . . [the] availability of the Primary Public Defender's Chief Trial Deputy." But, he explained, "there were a lot of moving parts in setting up the meeting."

Ultimately, Rumble's efforts were successful. In November 2018, the District Attorney notified him that the prosecution would be seeking LWOP instead of the death penalty. As a consequence, Rumble explained, the January 2019 trial date was continued to allow him time to prepare because LWOP cases and death penalty cases "require different strategies and different work." Trial was continued again when Dorey decided, in addition to his not guilty plea, to enter a plea of NGI in the alternative, and then a few

26

months later, to withdraw the NGI plea.[9]  Rumble explained the changes to Dorey's plea "necessitated additional work [and] additional strategies in terms of whether [there] would be two trials or one trial."

As for the action requests, Rumble explained that Dorey made "13 specific requests and . . . various subsections within those requests." Although Rumble was not "able to get every item," and not everything was "completed in the time that we would like," he "did investigate the case very zealously."  Rumble estimated he had submitted a total of 20 investigation requests to the trial court, and his lead investigator had spent 324 hours on the case.  Finally, as for Dorey's email history, Rumble explained that after trial concluded Dorey asked for copies of the emails that had been used by both sides.  Rumble's office assigned an intern to redact them.  It was a "big project," but he expected the emails to be delivered by the end of the month and planned to get every single one to Dorey.

Rumble said he sympathized with Dorey's "frustration with the amount of time it ultimately took to try the case in front of a jury."  However, in his view, he spent an incredible amount of time preparing.  In August alone, he personally spent 300 hours making final preparations for trial and handling the first four days of trial.

Based on this initial set of complaints, the trial court found no reason to relieve Rumble as counsel of record.  The court explained that, even if Rumble missed a substantial number of appointments, he met with Dorey 50

---

9    Rumble recalled that, when Dorey decided to change his plea, a March 2019 trial date and a May 2019 trial date were both continued.  He appears to be mistaken.  The minutes show the May 2019 trial date was continued because of the change of plea, but the March 2019 trial date was not.  The March trial date was continued upon request by the People.

times, which was "a lot," and "hardly constitutes a reason to have him relieved as counsel of record." With regard to Rumble's action requests, the court explained that it takes time to ensure that an investigation is conducted thoroughly. And when special circumstances are alleged, "it requires more than . . . the usual case preparation." Moreover, the court informed Dorey, the selection of questions for witness interviews is a matter within trial counsel's purview.

The trial court found no undue delay in the time it took to obtain an agreement from the District Attorney to not seek the death penalty. The court explained "sometimes [target] dates get pushed back." The court explained, "[t]here's a great deal of mitigating information that an attorney must procure in advance of any trial in hopes of convincing the prosecutor that the death penalty in that particular case is not appropriate." "[I]t is vital that every mitigating factor be presented in your favor before the District Attorney makes a decision. . . . [Y]ou do not want them to make a decision until they have everything to the positive, every mitigating factor." "There is so very much for an attorney to consider [in] regards [to] preparing . . . their mitigation package for the District Attorney's office, and you don't want to forget something. You don't want to leave anything out. And I would suggest that, as a result, the process, indeed, does take a while and perhaps longer than [counsel] would have hoped." "In addition, the District Attorney's office, likewise, once they receive the information from the defense, [it] takes a period of time to analyze it, to make a determination about how they would like to proceed. So this timeframe is, indeed, a very uncertain one, and all that any attorney can do on either side of the table is to make their best educated guess about when the decision might be made."

The trial court also found the time to proceed to trial to have been reasonable. The court stated, "[i]t doesn't seem at all unusual to me that it took a couple of years for this matter to proceed to trial, given everything involved and the issues involved, which include . . . the entering of a not-guilty-by-reason-of-insanity plea, withdrawal of it, and ultimately the litigation of the trial. [¶] These are complex matters for everybody involved. And when you throw into the equation that the District Attorney's office has alleged special circumstances, that makes the task of the defense attorney an onerous one, a difficult one."

After addressing this first set of complaints, the trial court told Dorey, "We can go through step by step each little thing, if you will, that you take exception with. But . . . I'm going to make the broad point that things take time." To the extent Dorey was concerned about delay, the court pointed out that if a new attorney was assigned to the case the attorney would not be ready to represent him at a retrial for another year or so. The court said it wanted Dorey to focus on issues "above and beyond" the time it took to proceed to the first trial. The court said, "I'm here to answer those questions to the extent I possibly can, and I'm happy to. . . . [¶] But I do want to focus on any real issues that would suggest [defense counsel] should be excused. [¶] Let's move on from matters that perhaps pre-dated the trial in this matter, wherein the jury could not make a decision, to . . . focus on where we are headed."

Dorey responded by stating his "big concern" was Rumble's ability to get things done in time for trial. The trial court responded by informing Dorey that delays to permit further investigation are generally ongoing throughout high stakes cases such as his. The court represented, based on its experience, that Rumble was an excellent attorney, "at the top of the heap."

29

The court noted that Rumble and the prosecution had both represented they could be ready on the date currently set for the retrial.

The court then explained that complaints about the time it took Rumble to proceed to the first trial, as well as the way it was handled, were unlikely to provide grounds to relieve him as counsel given that he successfully negotiated a commitment from the District Attorney to not seek the death penalty and prevented the prosecution from obtaining a guilty verdict. In layperson's terms, the court explained, "So if the frustration is, 90 percent, [']everything's taking so much time['], I would suggest this to you, for good purpose; because as things stand here right now, two things have occurred during the course of this litigation that benefit you: Number one, no death penalty. Your attorney did that. . . . Number two, [the case] proceeded to trial [and] you were not convicted. Both to your benefit. . . . [¶] So to the extent that . . . your primary issue relates to the time that it's taken, the decisions to be made to litigate the matter, understand that to this point, some good things have happened."

The trial court asked appellant if he had any other points to make. Dorey responded, "Quite a few." The court replied, "Well, we are not going to address quite a few, no. Because heretofore, the only issue really addressed relate[d] to frustration that things take time. I've told you why they take time. I have many, many, matters on my calendar, and we cannot spend the day together. I need you to focus on — I ask you [to] focus on issues that you think are real issues that should prompt me to have counsel relieved."

Dorey said he had "one last issue on timing." He told the trial court he provided Rumble with a new list of action requests. Next to each item on the list he left a blank space where he expected Rumble "to sign a promised completion date and to initial." The court explained it was unreasonable to

ask Rumble to make such assurances "when counsel is reliant upon the actions of others."

Dorey next brought up a series of complaints about how Rumble handled the case prior to and during the first jury trial. He complained that Rumble wasted a "very considerable amount of time working on a huge motion to exclude evidence," which was found to be without merit. Rumble explained he filed a motion to exclude evidence of cell phone records obtained under exigent circumstances because he did not have any evidence that the correct protocol was followed, and it was only after the motion was filed that he was able to determine that protocol had in fact been followed.

Dorey asserted that Rumble lost an email in which his father admitted assaulting his mother and giving her a black eye. Rumble denied losing an email and explained that Dorey was mistaken. There was an email that referred to the incident, but there was no email in which Dorey's father actually admitted to giving a black eye to Dorey's mother.

Dorey next complained that Rumble purportedly said he did not think attorneys at the District Attorney's office worked hard. At trial, however, the prosecutor had a PowerPoint presentation prepared for the opening and spent about two weeks putting on about 10 witnesses. By contrast the defense spent about two-and-a-half days putting on only three witnesses. The trial court explained that it was not reasonable to compare the prosecution case with the defense case in this manner, and that the prosecutor's case is usually longer because it has the burden of proving its case beyond a reasonable doubt.

Dorey complained that Rumble skipped over important questions from the script they prepared for his direct examination. He said the questions were important because they related to his father's prior violence against

him.  Rumble admitted he forgot to ask one question.  He explained he was in a "good groove" with Dorey and "did not end up asking it."

Dorey claimed Rumble did not provide him with all of the emails produced by the prosecution during discovery.  He asserted the prosecutor asked him questions on cross-examination about emails he had not seen, placing him "in a very compromised situation where [he] actually answered a question completely wrong."  Rumble represented he had arranged for an intern to go over the hundreds and hundreds of pages of emails with appellant, and she had made a spreadsheet of those emails.

Dorey complained that Rumble did not make objections to prosecutorial misconduct during closing argument even though the prosecutor "very overtly [and] completely fabricated lies and fictitious arguments out of thin air."  The court asked Rumble if the prosecutor made arguments that were not substantiated by the evidence.  Rumble said he thought the prosecutor's points were arguable and noted that he did raise some objections during her closing.  The court explained that if an argument is "within the realm of the evidence," a court is going to allow the argument, and experienced counsel has to make a tactical decision whether to make an objection or respond in the defense closing.

At this point in the proceedings, the court stated that it had spent about an hour, maybe less, addressing Dorey's concerns, and that it had "not heard anything to this point that would suggest that there's any basis upon which to relieve [defense counsel]."  The court said that it would allow Dorey to say a final word.  Dorey responded that he still had three pages left, and asked to read them.  The court asked him to summarize them.

Dorey complained that Rumble told him to not to look the jury in the eyes during the testimony, because it would make him appear anti-social,

untrustworthy, and unbelievable.  The court replied that attorneys have different "strategies and perspectives" about jurors.  The court explained that some attorneys are concerned that looking at jurors in their eyes can be perceived as intimidation.

After addressing this issue, the trial court told Dorey he was making "minor points."  The court said it was unrealistic for Dorey to expect everything in a criminal case to take place exactly when he wanted and every strategy and motion to be successful and executed perfectly.

Dorey then asked, "please give me the time" and complained that the defense had planned to present three character witnesses who had come in from Northern California, Washington, and Pennsylvania, but Rumble, in an "arbitrary, out-of-the-blue judgment call," decided to not have them testify.  Rumble explained that the witnesses were ready to testify, but the trial court judge made a ruling that restricted the scope of their expected admissible testimony.  Rumble represented that he and Dorey discussed whether to call the witnesses and Dorey agreed they would not call them.

Dorey next complained about how Rumble handled closing argument.  Dorey said he gave Rumble three pages of arguments that responded to the prosecution's argument, but Rumble "put the pages aside and ignored them."  Rumble responded that he and Dorey met several times about closing argument, and even met the night before, to incorporate appellant's ideas into his draft.  After the prosecutor rested, Dorey gave Rumble additional comments to incorporate into the closing argument, which he did.  After they took a lunch break, Dorey told Rumble he had additional arguments, but Rumble said he would not be able to incorporate them because at that point he had to get up in front of the jury.  The court explained to Dorey that, in its

33

view, there has to be a "particular flow" and "particular energy" to the closing argument and attorneys cannot just "throw[ ] things out there."

Finally, Dorey said he was concerned that Rumble had a "jaded view on the justice system" that was "almost defeatist and fatalistic." The court responded that there is nothing wrong with an attorney expressing some harsh realities and not sugar-coating things.

Dorey then said, "I get the sense that your mind is made up, [and] that before we started this hearing, you were going to make very thorough and comprehensive excuses for anything that I complained about." He accused the trial court of having "an idea that you were going to justify Mr. Rumble's work."

The trial court responded that it did not know beforehand what Dorey's concerns would be and had planned "to endeavor to address [Dorey's] questions as effectively [and] completely as [it] could." The court said the concerns expressed by Dorey were minor ones and, even taking them in their totality, did not provide a basis to conclude Rumble should be relieved as counsel. The court stated, "we are not going to go on and on for hours and hours about each small point to be made about the representation in the case. . . . [¶] . . . [W]e could take days, I suppose, talking about this strategy or that. That is not a base, though, to relieve counsel. And you haven't given me anything to this point to suggest that [your counsel has] done anything wrong, . . . that he hasn't adequately defended your interests to this point."

The trial court then brought the hearing to a close: "So we must at some point bring the hearing to a conclusion. I've given you an opportunity to make a big point, but instead, you have made several mini minor points. And I know they are important to you. I don't belittle any of that. [¶] [But] I must . . . have the record be made clear that I don't believe that these points

34

that have been made are a basis to relieve counsel, which is the purpose of this hearing. And I reiterate: I know [trial counsel] will ensure that he gives you his ear, spends additional time in preparation for the trial of this matter. [¶] I'm going to bring the hearing to a conclusion and deny the motion to relieve counsel, seal the hearing until further order of the court."

B.     *No Error*

When a defendant seeks substitution of counsel pursuant to *Marsden, supra,* 2 Cal.3d 118, "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*People v. Smith* (2003) 30 Cal.4th 581, 604.) Based on our review of the record, we conclude the trial court here fully complied with its obligation to allow Dorey an opportunity to be heard and explain his reasons for seeking substitute counsel.

As an initial matter, we first address what Dorey does *not* contend. He does not contend the record before the trial court established his counsel was failing to provide adequate representation. Nor does he contend the record established an irreconcilable conflict with his counsel.[10] He contends the

---

10     Indeed, to the contrary, Dorey asserted he did not "begrudge . . . Rumble at all for his good, hard work on [his] case," and "wish[ed] to maintain positive rapport with him." He also thanked Rumble on the record for obtaining an agreement from the District Attorney to seek life without parole and not the death penalty. He said, "[o]ne thing I did want to say about the death penalty was thank you very much for getting that cleared

35

court failed to conduct a proper *Marsden* hearing because it purportedly "did not conduct an inquiry *sufficient* to ascertain whether trial counsel had rendered ineffective assistance." (Italics added.) We find no error.

The trial court here gave Dorey a full opportunity to air his complaints. His concerns consisted of (1) complaints about purported missed deadlines and the time it took to bring the case to trial before the first jury, (2) allegations of evidence mismanagement involving lost and missing emails, and (3) disagreements with trial counsel over case strategy and trial tactics.

Starting with the first set of complaints—those that relate to alleged delay and other timing concerns—the record does not support Dorey's claim that the trial court only "allowed [Dorey] to air some grievances up to a point." The court responded in detail to all five of Dorey's complaints about the time it took to proceed to the first trial, plus his "big concern" about Rumble's ability in general to get things done in a timely manner. After hearing from Rumble and drawing on its own experience, the court reasonably concluded that two and half years to prepare for the first trial was justified given the special circumstance allegation, the successful negotiation over the death penalty, and Dorey's plea changes. The court reasonably informed Dorey that additional complaints about the time it took to proceed to the first trial would not change its mind, but then went on to entertain what Dorey stated was "one last issue on timing" anyway.

The record also shows the trial court addressed both of Dorey's complaints about alleged evidence mismanagement. Dorey claimed Rumble (1) lost an important email, and (2) failed to show him a set of emails that were used to impeach him at trial. The court inquired of Rumble about both

_____

up . . . . I sleep a lot better at night knowing that's not on the table any[ ] more."

36

complaints. Rumble denied he lost the email and said he had a paralegal review the emails and confirm that Dorey was mistaken about it being lost. He also denied Dorey was impeached with emails Dorey did not review. Rumble represented that, while Rumble himself was unable personally to review all of the emails, his office hired a law school intern to facilitate Dorey's review of them and that review was documented on a spreadsheet. After making this inquiry, the court "was 'entitled to accept counsel's explanation[s]' " and to conclude that Dorey's complaints were unfounded. (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

Finally, the record shows the trial court conducted an individualized inquiry in response to each of Dorey's concerns about case tactics and strategies. As discussed, those concerns were (1) Rumble brought a motion to suppress that was correctly denied, (2) he was wrong about the prosecutor's work ethic, (3) he refrained from making some potentially meritorious objections during closing argument, (4) he advised Dorey to refrain from looking at jurors in the eyes, (5) he chose to skip a single prepared question during Dorey's direct examination, (6) he did not call all of the character witnesses that were available to testify, (7) although Rumble incorporated most of the points that Dorey suggested into the defense closing argument, he did not incorporate a set of questions Dorey suggested to him after a lunch break, minutes before the proceedings recommenced, (8) the prosecution's case was longer than the defense case, and (9) overall, Rumble had a jaded view of the justice system.

The trial court either questioned Rumble or drew on its own experience, as appropriate, to respond to each concern. After approximately an hour, the court initially said it would allow Dorey a "final word," but then allowed Dorey to continue when he said he had three pages of concerns left and asked

37

"please give me the time." After numerous additional questions, when the court finally ruled on the motion, Dorey said nothing about still having more points to cover. The court then reasonably concluded that this final set of points raised by Dorey consisted of minor concerns that amounted to a disagreement about strategy. "Disagreement concerning tactics, by itself, is insufficient to compel discharge of counsel." (*People v. Smith, supra,* 30 Cal.4th at p. 606.) The record thus does not support Dorey's claim the trial court did not consider his entire list of grievances.

The record also contains no support for Dorey's vague and high-level claim that the trial court "should have inquired further into the specifics of [his] concerns." The nature of Dorey's concerns was not such that further inquiry had potential to reveal that Rumble was not providing adequate representation. Dorey does not explain what more the trial court needed to ask or know about his straightforward claim of undue delay, his complaints about lost and missing emails that the court explained were not lost or missing, or his exceedingly minor disagreements with a highly effective trial strategy. Indeed, the upshot of virtually all of Dorey's complaints was that Rumble purportedly took too long and made minor mistakes in the process of obtaining outstandingly favorable results: an agreement by the District Attorney not to seek the death penalty and a hung jury in a gruesome homicide case. Dorey does not explain how a more in-depth exploration of any particular issue—or all of them even—could potentially have led to a finding of inadequate representation by Rumble in the face of this remarkable success.

The trial court gave Dorey ample opportunity to be heard on his motion to relieve counsel.

## III.

### *No Discovery Error*

Dorey asks us to conduct an independent, in camera review of sealed records that were produced to the trial court by the San Diego County Sheriff's Crime Laboratory pursuant to a subpoena duces tecum.  The trial court reviewed the records and determined they contained no material that had to be provided to the defense.  The People agree an independent review is appropriate.  Appellate courts " 'routinely independently examine[ ] the sealed records of . . . in camera hearings to determine whether the trial court abused its discretion' " in many contexts.  (See, e.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1209 [motion to disclose confidential police personnel records]; *People v. Hobbs* (1994) 7 Cal.4th 948, 955, 975–976 [motion to disclose sealed portion of search warrant].)  We agree review is appropriate here.

We have reviewed the documents in camera, and we affirm the trial court's ruling.  Our independent review has not identified any information that should have been disclosed to the defense.  (§ 1050; *Brady, supra,* 373 U.S. 783.)

## IV.

### *The Parole Revocation Fine Must Be Stricken*

Dorey was sentenced to life without the possibility of parole.  There is no possibility of him ever being on parole.  Nevertheless, the minute order and abstract of judgment indicate the trial court imposed and suspended a $10,000 parole revocation fine pursuant to section 1202.45.

Section 1202.45, subdivision (a), provides: "In every case where a person is convicted of a crime *and his or her sentence includes a period of parole*, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation

39

restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (Italics added.) This additional restitution fine "shall be suspended unless the person's parole is revoked." (*Id.,* subd. (c).) We agree with Dorey and the People that the fine is unauthorized and must be stricken. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1183.) "When there is no parole eligibility, the fine is clearly not applicable." (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)

DISPOSITION

The judgment is modified to strike the parole revocation fine. With this modification in place, the judgment is affirmed. The trial court is directed to correct the abstract of judgment and send a copy to the Department of Corrections and Rehabilitation and all parties.

DO, Acting P. J.

WE CONCUR:


BUCHANAN, J.


KELETY, J.

40